# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

## CASE NO. 25-11558-E

---

### RONALD L. RUBIN, et al.,

### Appellants/Defendants

### v.

### LUCILLE RUBIN,

### Appellee/Plaintiff.

---

## ON APPEAL FROM THE UNITED STATES DISTRICT
## COURT FOR THE SOUTHERN DISTRICT OF FLORIDA
## CASE NO. 25-80258-CV
## HONORABLE DONALD M. MIDDLEBROOKS

---

## INITIAL BRIEF OF APPELLANTS

**HOLLAND & KNIGHT LLP**
Ilene L. Pabian
Christopher N. Bellows
701 Brickell Avenue, Suite 3300
Miami, Florida 33131
Tel: (305) 374-8500
ilene.pabian@hklaw.com
christopher.bellows@hklaw.com

**HOLLAND & KNIGHT LLP**
Brian H. Koch
515 East Las Olad Blvd., Suite 1200
Ft. Lauderdale, Florida 33302
Tel: (954) 525-1000
brian.koch@hklaw.com

*Counsel for Appellants*

Case No. 25-11558-E                                    *Ronald Rubin, et al. v. Lucille Rubin.*

## APPELLANTS' CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

In accordance with Federal Rule of Appellate Procedure 26.1 and the United States Court of Appeals for the Eleventh Circuit Rules 26.1-1 and 26.1-2, undersigned counsel for Appellants Ronald Rubin and the Walter and Lucille Rubin Foundation, Inc. give notice of the following trial judges, attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this appeal:

Barrett, Randi, agent of Plaintiff/Appellee

Bellows, Christopher N., Counsel for Appellants

Bideau, Mark, F. Counsel for Appellee

Burton, Honorable Charles E., Circuit Court Judge (state court probate proceeding)

Forman, Peter, Counsel for Plaintiff (state court probate proceeding)

Galler, Jonathan, A., Counsel for Plaintiff/Appellee

Greenberg Traurig, P.A., Counsel for Appellee

Gutter Chaves Josepher Rubin Forman Fleisher Miller P.A., Counsel for Plaintiff/Appellee

Holland & Knight LLP, Counsel for Defendants/Appellants

Koch, Brian H. Counsel for Defendants/Appellants

Lehrman, Roberta, agent of Plaintiff/Appellee

C-1 of 2

Levenson, Joshua R., Counsel for Defendants

Middlebrooks, Honorable Donald M., United States Magistrate Judge

Mora, Abraham, Counsel for Defendant (state court probate proceeding)

Mora Law PA, Counsel for Defendant (state court probate proceeding)

Norrow, Beth, Counsel for Randi Barrett and Roberta Lehrman, individually

    (other proceedings)

Pabian, Ilene L., Counsel for Appellants

Pandher, Bethany J.M., Counsel for Appellee

Proskauer Rose, LLP, Counsel for Plaintiff/Appellee

Rice, Eric A., Counsel for Plaintiff/Appellee

Rubin, Lucille, Plaintiff/Appellee

Rubin, Ronald L., Defendant/Appellant

Scherker, Elliot, H., Counsel for Appellee

The Walter and Lucille Rubin Foundation, Inc., Defendant/Appellant

WLR Holdings, LLC, interest holder in the Walter H. Rubin Estate

Counsel for Appellants certify that no publicly traded company or business entity apart from that listed above has an interest in the outcome of this case or appeal.

          */s/ Ilene L. Pabian*
          Ilene L. Pabian

C-2 of 2

## **<u>STATEMENT REGARDING ORAL ARGUMENT</u>**

Appellants Ronald Rubin and the Walter and Lucille Rubin Foundation, Inc. request oral argument in this matter. While we submit that the errors in the district court's order abstaining and remanding the matter are apparent, the briefs may not answer all of the Court's questions, and we welcome the opportunity to do so.

# TABLE OF CONTENTS

**Page**

APPELLANTS' CERTIFICATE OF INTERESTED PERSONS AND
CORPORATE DISCLOSURE STATEMENT ...................................................C-1

STATEMENT REGARDING ORAL ARGUMENT ................................................ i

TABLE OF CITATIONS .....................................................................................v

STATEMENT OF JURISDICTION.......................................................................1

STATEMENT OF THE ISSUES............................................................................1

STATEMENT OF THE CASE...............................................................................1

    A.    Nature of the Case .................................................................................1

    B.    Course of Proceedings and Disposition Below ....................................2

    C.    Statement of Facts .................................................................................5

        1.    Family Background and Creation of the Foundation .................5

        2.    Development of the Estate Plan and Trust Instruments..............6

        3.    Final Changes in 2021 and Appointment of Ronald .................7

        4.    Events Surrounding Walter's Death ...........................................8

        5.    Determination of Lucille's Incapacity .......................................8

        6.    Estate Administration and Trust Funding...............................10

        7.    Ongoing Litigation and Family Conflict .................................11

    D.    Standard of Review ..............................................................................12

SUMMARY OF ARGUMENT .............................................................................13

ARGUMENT .....................................................................................................15

ii

**TABLE OF CONTENTS**

**Page**

I. THE DISTRICT COURT ABUSED ITS DISCRETION IN ABSTAINING FROM EXERCISING JURISDICTION UNDER THE *COLORADO RIVER* ABSTENTION DOCTRINE ................................... 15

    A. The District Court Erred in Finding the State and Federal Proceedings Are Parallel .........................................................17

        1. The Parties Are Not Substantially the Same.............................18

        2. The Issues and Legal Frameworks Are Not Substantially the Same..................................................................19

        3. Superficial Factual Overlap Does Not Create Parallel Proceedings...................................................................20

        4. Precedent Confirms that Abstention is Unwarranted Absent True Parallelism...............................................................22

        5. The District Court's Decision Was a Serious Abuse of Discretion...................................................................................26

    B. The District Court Misapplied the *Colorado River* Factors................27

        1. Jurisdiction Over Property .........................................................28

        2. Convenience of the Forums .......................................................28

        3. Risk of Piecemeal Litigation.....................................................29

        4. Order in Which Jurisdiction Obtained ......................................30

        5. Governing Law ..........................................................................31

        6. Adequacy of the State Forum ....................................................31

II. THE DISTRICT COURT ERRED BY REMANDING INSTEAD OF STAYING THE FEDERAL CASE.........................................................33

CONCLUSION ......................................................................................................36

CERTIFICATE OF COMPLIANCE.....................................................................37

**TABLE OF CONTENTS**

**Page**

CERTIFICATE OF SERVICE.................................................................................38

ADDENDUM

# TABLE OF CITATIONS

**CASES** **Page**

*Abercrombie v. Andrew College,*
    438 F. Supp. 2d 243 (S.D.N.Y. 2006) ..........................................................24

*Ambrose v. New England Ass'n of Sch. & Colls., Inc.*,
    100 F. Supp. 2d 48 (D. Me. 2000) ................................................................35

*\*Ambrosia Coal & Constr. Co. v. Pages Morales,*
    368 F.3d 1320 (11th Cir. 2004) ...............................................................*passim*

*Attwood v. Mendocino Coast Dist. Hosp.*,
    886 F.2d 241 (9th Cir. 1989) .......................................................................13

*Bates v. Van Buren Twp.*,
    122 Fed. App'x 803 (6th Cir. 2004) ............................................................33

*Beekman v. Indymac Fed. Bank,*
    2013 WL 12124623 (S.D. Fla. Feb. 15, 2013) .............................................34

*Brown v. Blue Cross & Blue Shield of Fla., Inc.,*
    2011 WL 11532078 (S.D. Fla. Aug. 8, 2011) ..............................................34

*Brown-Thomas v. Hynie,*
    441 F. Supp. 3d 180 (D.S.C. 2019) .............................................................23

*Burke v. Radiant Logistics Global Servs., Inc.*,
    2008 WL 2094919 (E.D. Mich. May 16, 2008) ...........................................35

*\*Colorado River Water Conservation District v. U.S.*,
    424 U.S. 800 (1976)...............................................................................*passim*

*Cook v. Marshall,*
    645 F. Supp. 3d 543 (E.D. La. 2022) ..........................................................24

*Freeman v. Wells Fargo Bank, N.A.*,
    No. 19-CV-80670-Middlebrooks,
    2019 WL 13147405 (S.D. Fla. Dec. 12, 2019) ............................................28

*\*Glassie v. Doucette,*
    55 F.4th 58 (1st Cir. 2022) ....................................................................22, 23

# TABLE OF CITATIONS

**CASES**                                                                                                    **Page**

*Gray v. Gray*,
    704 F. Supp. 3d 316 (D.N.H. 2023) ..............................................................25

*In re Delta Res., Inc.*,
    54 F.3d 722 (11th Cir. 1995) ........................................................................5

*Jackson-Platts v. Gen. Elec. Cap. Corp.*,
    727 F.3d 1127 (11th Cir. 2013) .........................................................*passim*

*Jimenez v. Rodriguez-Pagan*,
    597 F.3d 18 (1st Cir. 2010)..........................................................................33

*LaDuke v. Burlington N. R.R. Co.*,
    879 F.2d 1556 (7th Cir. 1989) ...............................................................33, 34

*LeChase Constr. Servs., LLC v. Argonaut Ins. Co.*,
    63 F.4th 160 (2d Cir. 2023) ........................................................................33

*Montanore Minerals Corp. v. Bakie*,
    867 F.3d 1160 (9th Cir. 2017) ....................................................................33

*Moorer v. Demopolis Waterworks & Sewer Bd.*,
    374 F.3d 994 (11th Cir. 2004) ...................................................16, 33, 34, 35

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983)...............................................................................*passim*

*Quackenbush v. Allstate Ins. Co.*,
    517 U.S. 706 (1996)....................................................................................1

*Roche Cyrulnik Freedman LLP v. Cyrulnik*,
    582 F. Supp. 3d 180 (S.D.N.Y. 2022) ....................................................24, 25

*Saucier v. Aviva Life & Annuity Co.*,
    701 F.3d 458 (5th Cir. 2012) ..................................................................33, 35

*Taveras v. Bank of Am., N.A.*,
    89 F.4th 1279 (11th Cir. 2024)....................................................................12

*Utterback v. Morris*,
    2025 WL 1455900 (11th Cir. May 21, 2025)..................................................5

**<u>TABLE OF CITATIONS</u>**

**CASES**                                                                                                            **Page**

*Wilcox v. La Pensee Condominium Association, Inc.*,
    No. 21-81565-CV,
    2022 WL 22902217 (S.D. Fla. May 31, 2022)..............................................21

*Willson v. Bank of Am., N.A.*,
    No. 15-14303-CV-Middlebrooks,
    2016 WL 8943333 (S.D. Fla. May 23, 2016),
    *aff'd,* 684 Fed. App'x 897 (11th Cir. 2017) .............................................28, 34

**STATUTES**

Section 733.504, Florida Statutes (2025)...........................................................19, 20

Section 736.0202(1), Florida Statutes (2025)........................................................28

Section 736.0706(2), Florida Statutes (2025)....................................................19, 20

## STATEMENT OF JURISDICTION

This is an appeal of a final judgment of the United States District Court for the Southern District of Florida. The district court had subject-matter jurisdiction under 28 U.S.C. § 1332 because the parties are completely diverse and the amount in controversy exceeds $75,000. Appellants timely appealed the district court's April 9, 2025 order remanding the case to state court under the *Colorado River* abstention doctrine. This Court has appellate jurisdiction under 28 U.S.C. § 1291. *See Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 714–15 (1996).

## STATEMENT OF THE ISSUES

1.      Whether the district court abused its discretion in finding that the federal and state proceedings were "parallel" under *Colorado River Water Conservation District v. United States*, 424 U.S. 800 (1976).

2.      Whether the district court abused its discretion in finding that the majority of *Colorado River* factors weigh in favor of abstention.

3.      Whether the district court erred by remanding the federal case to state court rather than staying it.

## STATEMENT OF THE CASE

**A.      Nature of the Case**

Appellants Ronald L. Rubin ("Ronald") and the Walter and Lucille Rubin Foundation, Inc. (the "Foundation") (collectively, "Appellants") are challenging a

1

final order that granted the motion to abstain filed by Appellee Lucille Rubin ("Lucille" or "Plaintiff") and remanded the trustee removal matter filed by Plaintiff against Appellants to state probate court under the *Colorado River* abstention doctrine.

## B.    Course of Proceedings and Disposition Below

This appeal concerns the latest of several lawsuits in a contentious family dispute that began shortly after the Rubin family patriarch, Walter H. Rubin ("Walter"), died on April 11, 2021. The Estate of Walter H. Rubin (the "Estate") is still being administered by the Honorable Charles E. Burton in the probate division of the Fifteenth Judicial Circuit in Palm Beach County, Florida, *In re Estate of Walter H. Rubin,* 50-2021-CP-001979 (the "probate case").

While members of the Rubin family, as well as the Foundation, have engaged in substantial litigation in both state and federal court over various matters, including the validity of Walter's testamentary documents, the mental capacity and guardianship of Walter's widow, Lucille, legal ownership of Estate assets, control of the Foundation, trust administration, and control of several companies (*See, e.g.,* ECF No. 11 at 2; ECF No. 11-1 at 8-9; ECF No. 11-2 at 35-48; ECF No. 13-3 at 2-7; ECF No. 13-4 at 2-7; ECF No. 13-5 at 2-9; ECF No. 13-6 at 2-15; ADD 1), this appeal concerns two discrete proceedings instituted by Lucille's daughters (and designated agents), Roberta Lehrman ("Roberta") and Randi Barnett ("Randi") on

2

Lucille's behalf after she was deemed mentally incapacitated due to dementia (likely Alzheimer's Disease), from which she had suffered for years prior to Walter's death.[1,2,3]

On January 24, 2025 (barely one year after Ronald's personal representative and trustee appointments), Roberta and Randi (collectively, "the Sisters"), on behalf of Plaintiff, filed a petition in the probate case seeking Ronald's removal as personal representative of the Estate (the "PR Petition"). (ECF No. 11-2). That same day, Plaintiff (via the Sisters) filed a new, separate civil lawsuit in state court seeking Ronald's removal as trustee of the Second Amended and Restated Walter H. Rubin Declaration of Trust (the "Walter Trust") and the Marital Trust subtrust (the "Marital Trust") created for Lucille's benefit (together, "the Trusts") (the "Trustee Lawsuit"). (ECF No. 1-2). The Foundation was named as a defendant in the Trustee Lawsuit, which was assigned to Judge Burton.

Appellants removed the new Trustee Lawsuit to federal court on February 24,

---

[1] Given space constraints and the narrowness of the issues in this appeal, Appellants limit their recitation of the Statement of the Case to only the most pertinent procedural background and facts.

[2] The district court docket entries are referred to by ECF number.

[3] Lucille was adjudicated mentally incapacitated in February 2023. (ECF No. 13-5 at 2).

2025 based on diversity jurisdiction. (ECF No. 1). Plaintiff did not oppose removal.[4]

Three days later, Appellants filed their Answer and Affirmative Defenses, and Counterclaim for Declaratory Relief in the Trustee Lawsuit. (ECF No. 5). In the Counterclaim, Appellants asked the district court to resolve two legal issues not previously addressed by the state court: (1) whether alleged conflicts of interest may support Ronald's removal as trustee despite the Walter Trust's express waiver of such conflicts; and (2) whether the Walter Trust sets a heightened standard of care requiring bad faith or reckless indifference for trustee liability. (*Id.* at 13-14). In response to the PR Petition in the probate case, Appellants filed a motion to dismiss the PR Petition, which, to date, has not been set for hearing. Notably, administration of the Estate is nearing completion, which would effectively moot the PR Petition.

On March 24, 2025, Plaintiff moved to abstain and remand the Trustee Lawsuit back to state court under *Colorado River Water Conservation District v. U.S.,* 424 U.S. 800 (1976) ("*Colorado River*") ("Motion to Abstain"). (ECF No. 11). The same day, Plaintiff filed her Answer to the Counterclaim. (ECF No. 12). Appellants opposed the request to abstain and remand (ECF No. 13), arguing that the Trustee Lawsuit and the PR Petition are not "parallel" proceedings under

---

[4] Plaintiff admitted in a subsequent pleading that Ronald is a resident and citizen of Washington, D.C., and that the trusts are residents of Washington, D.C., thereby creating diversity jurisdiction, and that the district court was an "appropriate venue." (ECF No. 12 at 1, 2).

*Colorado River*, that the *Colorado River* factors do not weigh in favor of abstention, and that there is no precedent permitting remand to state court—as opposed to stay or a dismissal—of a lawsuit under *Colorado River*. (*Id.* at 3-15).

Nevertheless, on April 9, 2025, the district court granted the Motion to Abstain and remanded the Trustee Lawsuit back to state court under *Colorado River*. ("Remand Order"). (ECF No. 14). Appellants timely appealed the Remand Order. (ECF No. 20). This Court denied Appellants' motion for stay on June 27, 2025.

## C.    Statement of Facts

Appellants provide this factual statement for background purposes only, citing to various pleadings and orders in the district court and the state court as support.[5]

### 1.    Family Background and Creation of the Foundation

Walter and Lucille were married for over six decades and had four children, sons Ronald and Richard Rubin, and daughters Roberta and Randi. (ECF No. 11 at

---

[5] Appellants include in an Addendum to this brief all cited state court and federal court orders and judgments in the related proceedings between the parties that are not contained in this record on appeal. The documents are identified by Addendum tab number and page number, "ADD 1 at 2."

The Court may take judicial notice of public records, including filings in other judicial proceedings, for purposes other than establishing the "truth of the matters asserted in the other litigation." *Utterback v. Morris,* 2025 WL 1455900, at *5 (11th Cir. May 21, 2025) (citations and internal quotation marks omitted). *See also In re Delta Res., Inc.,* 54 F.3d 722, 725 (11th Cir. 1995) ("[T]his Court may take judicial 'notice of another court's order … for the limited purpose of recognizing the 'judicial act' that the order represents or the subject matter of the litigation and related filings.") (citations omitted).

2). In 2007, Walter and Lucille established the Foundation to support various charitable causes. (ECF No. 13-4 at 3). Walter later designated the Foundation as a residual beneficiary of the Marital Trust. (ADD 3 at 14). Walter and Lucille were the Foundation's sole members. (ECF No. 13-4 at 3).

    2.    <u>Development of the Estate Plan and Trust Instruments</u>

Over the years, Walter and Lucille adopted several estate plans. As reflected in the probate court's Final Judgment on Competing Petitions for Administration, some early iterations made no provision for their children, instead leaving the estate to the surviving spouse and the remainder to the Foundation. (ADD 3 at 3). In January 2008, Walter executed the original Walter Trust (ECF 1-2 at 20; ADD 3 at 3), later amended in 2019 to establish the Marital Trust for Lucille and create subtrusts allocating $2.5 million each to Roberta, Ronald and Richard. (ADD 3 at 14). Randi was not named in the 2018 amendment, and was specifically excluded from every will and trust document executed by Walter and Lucille between 2008 and Walter's death on April 11, 2021. (*Id*).

On August 29, 2019, Walter executed an amended and restated version of the Walter Trust. (ECF 1-2 at 17-46). This version increased Ronald's and Richard's subtrusts to $5.1 million and Roberta's to $5 million, added $100,000 bequests to Ronald and Richard upon Walter's death, and continued to expressly disinherit Randi and exclude her from receiving a trust. (*Id.* at 22-23, 25). The estate planning

documents drafted by attorneys from the Gutter Chaves law firm in 2018 and 2019 provided that two attorneys from that firm would both have duplicative, multiple fiduciary positions upon Walter's death, pursuant to which they could seek millions of dollars in various fees and could take over control of the Foundation. (*Id.* at 39; ECF No. 5 at 7; ADD 3 at 13-15). Walter ultimately wanted control of his estate to be kept in the family, and additional trust amendments were executed in March and April 2021. (ECF No. 1-2 at 47-61).

       3.       <u>Final Changes in 2021 and Appointment of Ronald</u>

In March 2021, Walter and Lucille retained attorney Abraham Mora to revise their estate documents. (ADD 3 at 15). Among the revisions, Ronald was named personal representative of the Estate, trustee of the Trusts, and a successor member and director of the Foundation upon Walter's death. (ECF No. 13-4 at 3; ADD 1 at 6; ADD 3 at 15-16). Walter also designated Ronald as Walter's and Lucille's preneed guardian, durable power of attorney and health care surrogate. (ADD 1 at 6). The amendments further increased the subtrusts for Ronald, Richard and Roberta, and directed that distributions be made upon the first death of either parent. (ECF No. 1-2 at 56-61; ADD 1 at 6).

Attorney Mora and others testified that Walter had testamentary capacity and was lucid during conversations outside the presence of Ronald, and that Walter chose Ronald to hold fiduciary roles based on his legal and business background,

knowledge of Walter's businesses and affairs, and their personal relationship. (ADD 3 at 9-11).

4.    Events Surrounding Walter's Death

The probate court found that, in the final month of Walter's life, Ronald provided daily care to both parents in Florida, as Lucille had been suffering from dementia and Alzheimer's Disease for several years. (ADD 3 at 5-7). According to the probate court, the Sisters and Richard had limited or no contact with their parents during this time. (*Id.* at 6). Within days of Walter's funeral, the Sisters (including the estranged Randi) took Lucille to Gutter Chaves' office, where "Lucille" rehired the Gutter Chaves attorneys and executed new durable powers of attorney and preneed guardian designations in the Sisters' favor. (ADD 1 at 9).

On May 10, 2021, "Lucille" revised her estate plan, removing the Foundation as her sole heir, and providing for equal distribution of her assets among her four children. (*Id.*). The next day, Ronald initiated incapacity proceedings, which were assigned to Judge Burton. (ADD 1). Shortly thereafter, the Sisters took Lucille back to Gutter Chaves, where Lucille signed documents disinheriting Ronald and Richard and naming the Sisters as her sole heirs. (*Id.* at 9).

5.    Determination of Lucille's Incapacity

As explained in Judge Burton's incapacity order, in the summer of 2022, Lucille was evaluated by a three-member examining committee, each of whom

8

concluded she was incapacitated. (*Id,.* at 3-4). An incapacity and guardianship trial was held in early 2023. (*Id.* at 2). During those proceedings, Roberta testified that she and Randi each had received $5 million "gifts" from Lucille within months of Walter's death. (*Id.* at 17).

In February 2023, Lucille was adjudicated incapacitated. (*Id.* at 21; ECF 13-3 at 2). Rather than appoint a guardian, the state court determined that the Sisters' authority under existing designations of health care surrogate and durable powers of attorney provided a lesser restrictive alternative. (ADD 1 at 18, 21). Since that time, the Sisters have prosecuted and defended all litigation in Lucille's name. (*See, e.g.,* ECF No. 13-5 at 3-4, 7; ECF No. 13-6 at 2-15; ADD 1; ADD 2; ADD 3; ADD 4).

Before Lucille's adjudicated incapacity, the parties had litigated a federal action in the Southern District of Florida before District Judge Kenneth Marra regarding control of the Foundation, and the Foundation's governing documents. *Rubin v. Rubin,* Case No. 21-82014-CIV-MARRA (S.D. Fla.). That proceeding included an evidentiary injunction hearing held over several months in early 2022, after which Judge Marra denied Lucille's request for injunctive relief. (ECF No. 13-4 at 7). In 2023, following the formal adjudication of Lucille's incapacity, Judge Marra found that Lucille lacked standing to maintain her claims, which were dismissed. (ECF No. 13-5 at 6-9). He also found that the Sisters, whom the Gutter Chaves attorneys had recently substituted for Lucille in the Foundation, did not have

9

any greater rights than their mother, who was now incompetent. (*Id.* at 7). Judge Marra later denied the Sisters' motion to intervene and vacate the court's ruling. (ADD 2).

### 6. Estate Administration and Trust Funding

Under the operative estate plan, the Estate's assets pour over into the Walter Trust, which then funds the Marital Trust. (ECF No. 11-1 at 2; ADD 4 at 2). Lucille is entitled to income from the Marital Trust and may receive discretionary principal distributions for her benefit. *Id.* Upon Walter's death, the Estate included approximately $81 million in cash and securities, as well as interests in three limited liability companies (Kingshop Company, LLC, WLR Holdings, LLC and Rubco LLC, collectively "the LLCs"), each holding commercial real estate. (*Id.*).

In July 2023, Lucille (via the Sisters) moved for a partial distribution from the Estate for income accrued through June 30, 2023. (*Id.*). In October 2023, the probate court approved a $2,000,000 distribution to Lucille from the Estate. (ECF No. 13-9 at 2; ADD 4 at 2).

On December 31, 2023, in accordance with Walter's estate plan, the state court formally appointed Ronald as personal representative ("Personal Representative") of the Estate. (ECF No. 13-8; ADD 4 at 2). Also pursuant to Walter's estate plan, Ronald began serving as trustee ("Trustee") of the Trusts, as well as the subtrusts for Roberta, Ronald, and Richard. (*Id.*).

In May 2024, Lucille (again through the Sisters) sought a second partial distribution from the Estate, and requested that Ronald fund the Walter Trust, Marital Trust, and the children's sub-trusts. (ECF 13-10 at 2-7; ADD 4 at 2). Following an October 2024 hearing, the court ruled it had authority to rebalance or adjust the asset composition of the Estate to account for the period of time the Estate did not have a fiduciary (due to litigation challenging Walter's estate documents). (ECF No. 11-1 at 8-9).

In January 2025, Plaintiff (via the Sisters) filed separate actions to remove Ronald as Personal Representative of the Estate and to remove him as Trustee of the Trusts. (ECF Nos. 1-2, 11-2). On February 24, 2025, in accordance with the probate court's order (ECF No. 13-11 at 2), Ronald funded the Marital Trust and transferred the Estate's entire interest in the LLCs into that trust. (ADD 4 at 3). The petition to remove Ronald as Trustee was filed barely one year after Ronald had been appointed Trustee, before the Trusts had been funded or Ronald had taken substantive trustee actions.

7.    Ongoing Litigation and Family Conflict

The probate record, some of which is included in the record on appeal, reflects a history of familial strain and disagreement over estate administration and fiduciary authority. According to the probate court, Ronald maintained consistent contact with his parents in the years leading up to Walter's death, calling them daily and assisting

11

in their medical care and administrative matters. (ADD 3 at 5-6). He also visited and cared for them every day during Walter's final weeks. (*Id.* at 6). In contrast, (a) Richard visited once in the two years prior to Walter's death; (b) Roberta had limited contact and no role in caregiving between 2018 and 2021; and (c) in the four years before Walter passed away, Randi saw her parents for only a few hours, just days before Walter passed away. (*Id.*).

According to Appellants' Answer and Affirmative Defenses, after Walter's death and Lucille's incapacity, the Sisters reengaged Gutter Chaves (whom Walter and Lucille had fired), and assumed full control over Lucille's personal, financial and legal matters. (ECF No. 5 at 7-8). These developments have fueled ongoing disputes over fiduciary roles and the administration of family assets—culminating in the two separate and distinct proceedings now at issue in this appeal—one seeking Ronald's removal as the Estate's Personal Representative, and the other seeking his removal as Trustee of the Trusts.

### D.    Standard of Review

This Court reviews a district court's decision to abstain from exercising jurisdiction pursuant to *Colorado River* for abuse of discretion. *Taveras v. Bank of Am., N.A.,* 89 F.4th 1279, 1285 (11th Cir. 2024); *Jackson-Platts v. Gen. Elec. Cap. Corp.*, 727 F.3d 1127, 1133 (11th Cir. 2013). A district court abuses its discretion

12

when it applies the wrong legal standard, misapplies the correct standard, or makes a clearly erroneous factual finding. *Id.*

The district court's decision regarding the type of relief to order when it declines to exercise jurisdiction under *Colorado River* is reviewed *de novo*. *Attwood v. Mendocino Coast Dist. Hosp.,* 886 F.2d 241, 242 (9th Cir. 1989).

## SUMMARY OF ARGUMENT

The district court abused its discretion by remanding the Trustee Lawsuit to state court under the *Colorado River* abstention doctrine. Well-settled precedent dictates that *Colorado River* abstention is not permitted unless (1) the federal and state proceedings are "parallel"—meaning they involve essentially the same parties and issues—and (2) exceptional circumstances justify the surrender of jurisdiction under a multi-factor analysis.

The district court wrongly found that the Trustee Lawsuit and the PR Petition are parallel, even though they involve different parties, different fiduciary roles, distinct legal claims and different requested relief. The Trustee Lawsuit concerns Ronald's suitability to serve as Trustee under the Florida Trust Code, while the PR Petition addresses his fitness to act as Personal Representative under the Probate Code. These are distinct fiduciary roles governed by separate legal frameworks. Further, the Foundation is a party to the Trustee Lawsuit, but not the PR Petition. The PR Petition cannot resolve the distinct trust-specific issues raised solely in the

13

Trustee Lawsuit. The district court's finding of parallelism based on shared "factual and relational underpinnings" disregards controlling law and overlooks the critical fact that *Plaintiff* filed two separate actions asserting different legal theories and claims. On this record, the proceedings are plainly not parallel, and the district court's contrary finding is clearly erroneous.

The district court also erred in finding that the majority of *Colorado River* factors supported abstention. Its analysis was superficial, misapplied the governing legal standards, ignored the key differences between the cases, and contradicted its own prior abstention rulings. A proper analysis confirms that none of the *Colorado River* factors favors abstention, and most weigh strongly against it. Neither the federal court nor the state court assumed jurisdiction over Florida property, both forums are equally convenient, the proceedings will not result in abnormally excessive piecemeal litigation, the federal trust case has progressed further and does not involve unusually complex or novel issues, and both forums are adequate to protect the parties' rights. Consequently, the district court clearly erred in finding that two of the *Colorado River* factors were irrelevant and the remainder favored abstention.

The Remand Order cannot stand under any circumstances. Even assuming *arguendo* that abstention was warranted, the district court reversibly erred by remanding the Trustee Lawsuit instead of staying it pending resolution of the state

14

probate matter. Federal courts have consistently held that a stay—not remand—is the proper procedural remedy when abstaining under *Colorado River*, as it preserves federal jurisdiction and avoids potential procedural complications. The district court nonetheless granted remand at Plaintiff's express and erroneous request, despite the settled law that remand is legally improper in this context. That part of the Remand Order alone warrants reversal.

Because the district court abused its discretion by applying the wrong legal standard and making clearly erroneous factual findings, this Court should reverse the Remand Order and direct reinstatement of the Trustee Lawsuit in federal court. At a minimum, Appellants are entitled to a stay of the federal action pending the outcome of the state probate proceeding.

## ARGUMENT

## I.

### THE DISTRICT COURT ABUSED ITS DISCRETION IN ABSTAINING FROM EXERCISING JURISDICTION UNDER THE COLORADO RIVER ABSTENTION DOCTRINE

In *Colorado River,* 424 U.S. at 818-20, the Supreme Court held that a federal court may abstain from exercising jurisdiction in certain instances where there is a parallel state court proceeding, based on considerations of "wise judicial administration" that counsel against duplicative lawsuits. Because the federal courts have a "virtually unflagging obligation" to exercise the jurisdiction conferred on

15

them, and a pending action in state court "is no bar to proceedings concerning the same matter in the Federal court," *id.* at 817-18, *Colorado River* abstention applies only in "exceptional circumstances." *Id.* at 813. *Accord Jackson-Platts,* 727 F.3d at 1140.

Indeed, as the Supreme Court has explained, and this Court has repeatedly warned, abstention is "'an extraordinary and narrow exception'" to a district court's obligation to adjudicate cases properly before it. *Id.* (quoting *Colorado River,* 424 U.S. at 813). *Accord Moorer v. Demopolis Waterworks & Sewer Bd.*, 374 F.3d 994, 997 (11th Cir. 2004) (federal courts may utilize *Colorado River* to "defer to a parallel state proceeding under 'limited' and 'exceptional' circumstances") (quoting *Colorado River,* 424 U.S. at 817-18). As such, in reviewing a decision to abstain under *Colorado River*, the appellate court's task is "not to find some substantial reason for the *exercise* of federal jurisdiction by the district court; rather, [it] is to ascertain whether there exist 'exceptional' circumstances, the 'clearest of justifications,' … to justify the *surrender* of that jurisdiction." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25-26 (1983) (emphasis in original). What is abundantly clear is that abstention is "the exception, not the rule." *Colorado River,* 424 U.S. at 813.[6]

---

[6] While federal abstention is generally disfavored, *Colorado River* abstention is "particularly rare," and appropriate only when both true parallelism and exceptional circumstances are clearly established. *Jackson-Platts,* 727 F.3d at 1140. *Accord*

In light of these firmly-established legal principles, the district court's decision to abstain and remand the Trustee Lawsuit to state court under *Colorado River* was an abuse of discretion. The Trustee Lawsuit and the PR Petition are not "parallel" in any meaningful legal sense, and there are no exceptional circumstances warranting the application of this narrow exception. The court conducted only a cursory analysis of the two proceedings and misapplied the applicable law. Rather than recognizing abstention as a rare and exceptional measure, the court treated it as a routine procedural option—contrary to its "robust duty" to exercise jurisdiction. *Ambrosia Coal*, 368 F.3d at 1331. The decision to abstain was entirely improper.

**A.    The District Court Erred in Finding the State and Federal Proceedings Are Parallel**

The district court erred in finding that the Trustee Lawsuit and the PR Petition are "parallel" proceedings under the *Colorado River* abstention doctrine. (ECF No. 14 at 4). That determination contradicts established law and overlooks key differences in the parties, fiduciary roles, claims, remedies, and governing legal frameworks. It also ignores the procedural reality that *Plaintiff herself filed these as two separate actions*—on the same day, in the same state court—under distinct legal theories.

---

*Ambrosia Coal & Constr. Co. v. Pages Morales,* 368 F.3d 1320, 1331 (11th Cir. 2004) (*Colorado River* abstention permissible in fewer circumstances than other abstention doctrines, which themselves carve out only "slender exceptions to the robust duty to exercise jurisdiction").

As a threshold matter, abstention under *Colorado River* is permitted only where there exists a "parallel" state action—that is, one involving "'substantially the same parties and substantially the same issues.'" *Jackson-Platts*, 727 F.3d at 1140 (quoting *Ambrosia Coal*, 368 F.3d at 1330). While complete identity of parties and issues is not required, the state action must provide an "adequate vehicle for the complete and prompt resolution" of the issues between the parties in the federal action. *Moses H. Cone*, 460 U.S. at 28. If there is "any substantial doubt" about whether the federal case will be fully resolved by the state proceeding, abstention constitutes a "serious abuse of discretion." *Id.*

Here, that doubt is not just substantial—it is dispositive. The PR Petition cannot fully resolve the Trustee Lawsuit, which raises distinct claims involving different parties and fiduciary duties governed by a separate statutory framework. The district court's finding of parallelism is therefore legally untenable.

### 1.    The Parties Are Not Substantially the Same

The Trustee Lawsuit includes the Foundation—a Delaware corporation and a remainder beneficiary of the Marital Trust—as a named defendant. (ECF No. 1-2). The Foundation is not a party to the PR Petition, and the probate court cannot adjudicate trust claims against non-parties. This alone defeats any finding of parallel proceedings.

## 2.    The Issues and Legal Frameworks Are Not Substantially the Same

Moreover, the claims asserted in the two actions are grounded in different legal frameworks, fiduciary roles, and factual contexts. The Trustee Lawsuit seeks Ronald's removal as Trustee under the Florida Trust Code, Section 736.0706(2), Florida Statutes (2025). (ECF No. 1-2). This statute permits removal for serious breaches of trust, unfitness, unwillingness or persistent failure to administer the trust effectively, or a substantial change of circumstances. § 736.0706(2), Fla. Stat. The analysis is discretionary and context-dependent, with the over-arching goal of serving the best interests of the trust and its beneficiaries. In contrast, the PR Petition invokes Section 733.504, Florida Statues (2025) of the Probate Code, which sets forth specific statutory disqualifications for personal representatives, such as adjudicated incapacity, insolvency, or waste of estate assets. (ECF No. 11-2). The analyses under these statutes are neither interchangeable nor coextensive.

The probate litigation focuses on Ronald's alleged mismanagement of estate assets and potential conflicts of interest in his role as Personal Representative. (ECF No. 11-2 at 4-11). The Trustee Lawsuit, on the other hand, addresses ongoing concerns about trust administration, including alleged breaches of fiduciary duty related to investment strategy, failure to fund or manage the Marital Trust, and purported conflicts with the Foundation. (ECF No. 1-2 at 5-14). These issues extend

19

well beyond the scope of estate administration, and may persist after the probate estate is closed.

Moreover, the trustee-focused claims raised only in the Trustee Lawsuit cannot be adjudicated in the probate proceeding. The two actions involve different fiduciary roles, governed by distinct statutes, legal standards, and evidentiary burdens. A ruling on Ronald's qualifications to continue serving as Personal Representative under Section 733.504 has no bearing on whether he should be removed as Trustee under Section 733.0706(2). The duties, conduct, and beneficiaries involved in each role are entirely different, precluding any finding that the two proceedings are parallel.

The relief sought also highlights this divergence. In the Trustee Lawsuit, Plaintiff seeks removal of the trustee, modification of trust terms, the appointment of an independent successor trustee, and attorneys' fees under the Trust Code. (ECF No. 1-2 at 14-15). The PR Petition seeks only removal and replacement of the personal representative and recovery of attorneys' fees and costs. (ECF No. 11-2 at 11-12). The fundamentally different remedies sought underscore that these are separate legal claims requiring distinct factual and legal analyses.

### 3.   Superficial Factual Overlap Does Not Create Parallel Proceedings

The district court nonetheless determined that the two cases are parallel because they share "factual and relational underpinnings." (ECF No. 14 at 4).

However, that reasoning elevates form over substance. Overlapping background facts do not render two legally and functionally different proceedings "parallel" under *Colorado River.* As the Supreme Cour explained in *Moses H. Cone,* parallelism exists only where "the federal court will have nothing further to do in resolving any substantive part of the case." 460 U.S. at 28.

The district court itself has recognized this principle. In *Wilcox v. La Pensee Condominium Association, Inc.,* No. 21-81565-CV, 2022 WL 22902217, at **3-4 (S.D. Fla. May 31, 2022), the same judge denied *Colorado River* abstention where a federal housing claim and a state eviction suit shared facts but pursued different claims. "Mere relatedness or overlapping factual bases for different legal claims is not enough." *Id.* at *3.

The same is true here. Plaintiff's gratuitous inclusion of tangential trust-related allegations in the PR Petition does not somehow transform the PR Petition into a proceeding capable of resolving the separate substantive claims raised in the federal Trustee Lawsuit.

The district court also stated that "[t]he facts and procedural history of this matter warrant abstention, regardless of how this matter ended up in federal court, and which Party moved for relief." (ECF No. 14 at 5 n.3). This pronouncement misstates the applicable analysis. While the identity of the removing party may not control, the nature of the state proceeding and its relationship to the federal case are

21

not irrelevant—they are central to the abstention inquiry. Plaintiff's pursuit of two separate actions—filed on the same day, under separate legal theories—undermines any claim that the two actions are parallel. If their claims were legally or functionally the same, there would have been no need for Plaintiff to separate them.

### 4. Precedent Confirms that Abstention is Unwarranted Absent True Parallelism

Federal courts routinely reject *Colorado River* abstention in fiduciary disputes where the state and federal proceedings involve distinct legal issues, different remedies, or separate parties. The mere presence of overlapping facts or related family dynamics is not enough.

In *Glassie v. Doucette,* 55 F.4th 58, 62-63 (1st Cir. 2022), a daughter and beneficiary of her father's estate brought a federal lawsuit against other beneficiaries and the executor of the estate, alleging RICO violations and breaches of fiduciary duty in connection with an LLC and the estate. At the same time, she and her mother (the father's second wife) were pursuing removal and contempt proceedings in state probate court against the executor based on alleged fiduciary misconduct. *Id.* at 63-64. Although the two suits covered "common" ground and some of the parties overlapped, the First Circuit determined that the federal claims raised distinct issues that would not be resolved by the state court proceedings. *Id.* at 64-65. Reversing the district court's dismissal, the appellate court emphasized that *Colorado River* abstention must be applied narrowly and with caution, and that "substantial doubt"

22

as to whether the state litigation would completely resolve all claims in the federal case precluded abstention. *Id.* at 64. The court also rejected the argument that abstention was appropriate merely because the daughter *could* theoretically raise her federal claims in probate court, warning that "if that were sufficient to invoke abstention, abstention could become the rule, rather than the exception." *Id.* Accordingly, the court concluded that the case for *Colorado River* abstention "does not get to first base." *Id.* at 65. This decision makes clear that familial overlap and factually related disputes—without essentially the same claims and requested relief—cannot support abstention.

Likewise, in *Brown-Thomas v. Hynie*, 441 F. Supp. 3d 180, 192-93 (D.S.C. 2019), heirs of James Brown brought federal copyright and state law claims against his putative spouse, her child, and various fiduciaries. Although there was pending estate litigation in state court involving some of the same parties, the federal court found that abstention under *Colorado River* was inappropriate due to a lack of parallel proceedings. *Id.* at 217. The probate case focused on spousal status and estate administration, while the federal claims sought different remedies premised on broader fiduciary misconduct. *Id.* Because the state court could not resolve the federal claims, the district court found there was no showing of the requisite "parallelism of 'same issues'" and declined to abstain. *Id.* at 217-18.

23

Other courts have echoed these principles and reached similar conclusions in varied contexts. In *Abercrombie v. Andrew College,* 438 F. Supp. 2d 243, 245-51, 260 (S.D.N.Y. 2006), the district court refused to abstain under *Colorado River* in a federal action challenging the validity of a grantor's inter-vivos deed, even though related state probate litigation involved some overlapping parties disputing the validity of the grantor's will. Despite common themes and some shared parties, the court found the "essential element" of parallel proceedings lacking because the federal and state suits addressed the validity of different instruments executed at different times and under different circumstances. *Id.* at 258-59. Those distinctions were dispositive.

In *Cook v. Marshall*, 645 F. Supp. 3d 543, 548-49, 554 (E.D. La. 2022), the district court denied *Colorado River* abstention in a federal case seeking damages and trustee removal—relief not sought in the related pending state action between the parties. The court emphasized that the difference in available remedies made clear that the proceedings were not parallel. *Id.* at 554.

Similarly, in *Roche Cyrulnik Freedman LLP v. Cyrulnik,* 582 F. Supp. 3d 180, 186, 190-91 (S.D.N.Y. 2022), the district court found *Colorado River* abstention inappropriate where a partnership removal declaratory judgment action alleging fiduciary breach and tort claims could not be fully resolved by a pending Florida state partnership dissolution case. Although both cases stemmed from the same

24

underlying dispute, the federal action sought separate relief and raised different legal issues, defeating parallelism. *Id.* at 191.

Even where the same trust and trustee are involved, courts will not abstain under *Colorado River* if the cases relate to different claims or time periods. For example, in *Gray v. Gray*, 704 F. Supp. 3d 316, 318 (D.N.H. 2023), the court declined to abstain where dual actions challenging the same trustee's conduct under the same trust were pending in state and federal court. The claims concerned separate accounting periods and distinct alleged breaches, and the court found that resolution of the state probate matter would not necessarily dispose of the federal case. *Id.* The court further observed that concerns about piecemeal litigation do not justify abstention absent an "exceptional basis," and reiterated that overlapping issues or parties are insufficient to warrant abstention on their own. *Id* at 318-19.

These cases collectively underscore the high bar for abstention under *Colorado River.* Federal courts must exercise jurisdiction where properly invoked unless the state proceeding is truly parallel—that is, capable of resolving all claims in the federal case between substantially the same parties, based on the same issues and legal standards. That is plainly not the case here. The Trustee Lawsuit involves different parties, distinct fiduciary duties, a separate statutory framework, and broader relief than the PR Petition. Any one of those distinctions weighs against *Colorado River* abstention. Taken together, they absolutely preclude it.

**5.    The District Court's Decision Was a Serious Abuse of Discretion**

In light of this established precedent, the district court's finding that the PR Petition and the Trustee Lawsuit are parallel was both factually unsupported and legally erroneous. The clear distinctions in the two actions' parties, fiduciary roles, legal standards, and requested relief foreclose any finding that the PR Petition provides an "adequate vehicle" for adjudicating the Trustee Lawsuit claims. *Moses H. Cone,* 460 U.S. at 28.

Indeed, the existence of "substantial doubt" that the state court could fully resolve the claims in the federal case makes abstention a "serious abuse of discretion." *Id.* The current case squarely implicates this Court's admonition in *Jackson-Platts*: "[F]ederal courts have 'the virtually unflagging obligation… to exercise the jurisdiction given them,' … and this case presents nothing so extraordinary as to eviscerate that obligation." 727 F.3d at 1131 (quoting *Colorado River,* 424 U.S. at 817).

The Trustee Lawsuit raises discrete trust-specific issues, involves an additional party not named in the PR Petition, and seeks remedies that cannot be obtained in the probate proceeding. The district court's failure to account for these fundamental distinctions—and its reliance on superficial factual overlap—resulted in a misapplication of *Colorado River.* The Remand Order should be reversed.

26

**B.      The District Court Misapplied the Colorado River Factors**

Even if the threshold requirement of a parallel proceeding had been satisfied—which it clearly was not—there was no showing of the "exceptional circumstances" necessary to justify abstention under *Colorado River*. *See Jackson-Platts,* 727 F.3d at 1140. Courts consider six non-dispositive factors in determining whether such circumstances exist: (i) whether either court has assumed jurisdiction over property; (ii) the relative inconvenience of the fora; (iii) the potential for piecemeal litigation; (iv) the order in which jurisdiction was obtained and relative progress of the two actions; (v) whether state or federal law governs; and (vi) the adequacy of the state court to protect the parties' rights. *Id.* at 1141. No single factor is determinative, and they are weighed flexibly with a "heavy bias" in favor of exercising federal jurisdiction. *Id.*

The district court here erroneously found that the first two factors were "largely irrelevant," as neither forum had assumed jurisdiction over real property and both were equally convenient. (ECF No. 14 at 4). It then summarily found that the remaining four factors favored abstention. (*Id.*). In doing so, the district court misapplied or disregarded binding Eleventh Circuit law, which compels the opposite result. In truth, all six *Colorado River* factors either weigh against abstention or are, at best, neutral. The district court thus abused its discretion.

### 1.    Jurisdiction Over Property

The first *Colorado River* factor weighs against abstention where neither court has assumed jurisdiction over real property. *Jackson-Platts*, 727 F.3d at 1141. That is the case here. There is no real property at issue in Florida, and the Trusts' principal place of administration lies outside Florida. *Id.*; § 736.0202(1), Fla. Stat. (2025) (in rem jurisdiction over trust assets exists when Florida is principal place of administration). Accordingly, this factor weighs against abstention.

The district court clearly erred in finding this factor "irrelevant." (ECF No. 14 at 4). That finding contradicts both Eleventh Circuit precedent and the court's own prior decisions. *See Jackson-Platts,* 727 F.3d at 1141; *Freeman v. Wells Fargo Bank, N.A.*, No. 19-CV-80670-Middlebrooks, 2019 WL 13147405, at *3 (S.D. Fla. Dec. 12, 2019) (this factor "weighs against transfer when 'neither the district court nor the state circuit court assumed jurisdiction over any property'") (quoting *Jackson-Platts,* 727 F.3d at 1141); *Willson v. Bank of Am., N.A.,* No. 15-14303-CV-Middlebrooks, 2016 WL 8943333, at *3 (S.D. Fla. May 23, 2016) (same), *aff'd,* 684 Fed. App'x 897 (11th Cir. 2017).

### 2.    Convenience of the Forums

The convenience of the forums factor focuses "'primarily on the physical proximity of the federal forum to the evidence and witnesses.'" *Jackson-Platts,* 727 F.3d at 1141 (quoting *Ambrosia Coal,* 368 F.3d at 1332). Here, because both actions

were filed in Palm Beach County, the federal and state forums are equally convenient in terms of access to evidence and witnesses. Thus, this factor, too, "cuts against abstention." *Id.* The district court's contrary finding—labeling the factor "irrelevant"—is clearly erroneous. (ECF No. 14 at 4).

### 3.    Risk of Piecemeal Litigation

The third factor monitors the "potential for piecemeal litigation." *Jackson-Platts,* 727 F.3d at 1142. The district court found this factor favored abstention, citing the parties' "extensive history of litigation" in state court and asserting that allowing the Trustee Lawsuit to proceed in federal court would cause "substantial disruption and duplication." (ECF No. 14 at 4-5). That reasoning is flawed.

The mere potential for some duplication is insufficient. The relevant inquiry is whether concurrent proceedings would create a risk of "'abnormally excessive or deleterious'" piecemeal litigation. *Id.* (quoting *Ambrosia Coal,* 368 F.3d at 1333). And where litigation is "inevitably piecemeal"—as is the case here with distinct legal claims involving different fiduciary obligations—abstention is disfavored. *Jackson-Platts,* 727 F.3d at 1142 (citations and internal quotation marks omitted).

The two actions here raise different claims, governed by different statutes, involving different parties, and concerning different legal standards and evidence. Any potential overlap is minimal and falls squarely within the bounds of concurrent litigation. As this Court made clear in *Ambrosia Coal*: if overlap alone justified

abstention, "[a party] could always escape federal courts simply by filing parallel state lawsuits." 368 F.3d at 1333. Therefore, contrary to the district court's finding, this factor does not favor abstention.

### 4. Order in Which Jurisdiction Obtained

The fourth *Colorado River* factor considers not only the sequence of filings but the relative progress of the actions. *Moses H. Cone,* 460 U.S. at 21. Courts apply this factor pragmatically and flexibly "with a view to the realities of the case at hand." *Id.* The district court's finding that this factor supports abstention, like the others, ignores controlling precedent and the procedural history of the actions.

Here, the PR Petition and Trustee Lawsuit were separately filed on the same day by Plaintiff. This is not a classic *Colorado River* situation where a party files substantially similar claims in federal court in an attempt to preempt ongoing proceedings in state court filed by the opposing party. These matters, which are different, were both filed by the same party seeking abstention. Moreover, the Trustee Lawsuit has progressed further in federal court, with a counterclaim, and answers and affirmative defenses filed by all parties. By contrast, the PR Petition remains in an early procedural posture: a motion to dismiss remains pending but has not yet been set for hearing. Moreover, it is likely that the PR Petition will soon be moot as Estate administration nears completion.

Notably, Plaintiff herself conceded that the federal court is fully capable of resolving the trust issues. (ECF No. 11 at 12). In light of these facts, the fourth factor also weighs against abstention. *Moses H. Cone*, 460 U.S. at 21.

### 5.    Governing Law

Although the Trustee Lawsuit arises under Florida law, this factor supports abstention "only where the applicable state law is particularly complex" or better suited to state court adjudication. *Jackson-Platts,* 727 F.3d at 1143. That is not the case here.

The issues in the Trustee Lawsuit involve straightforward questions of trust interpretation and statutory authority under Florida's Trust Code. The district court found that this factor favored abstention based on the district court's sweeping conclusion that the matter is "complex" and "fact-intensive." (ECF No. 14 at 5). However, this finding conflates evidentiary complexity with legal complexity. The routine application of state law is well within the competency of federal courts, and is performed every day in diversity jurisdiction cases. Accordingly, this factor weighs against abstention or is, at most, neutral. *Jackson Platts,* 727 F.3d at 1143; *Ambrosia Coal,* 368 F.3d at 1334.

### 6.    Adequacy of the State Forum

The sixth factor is considered neutral where both the federal and state forums are adequate to protect the parties' rights. *Jackson-Platts,* 727 F.3d at 1143;

*Ambrosia Coal,* 368 F.3d at 1334. Nevertheless, the district court improperly treated the adequacy of the state forum as an affirmative reason to abstain—going so far as to call it a "superior venue." (ECF No. 14 at 5). That treatment was legal error.

Plaintiff has acknowledged that the federal court is competent to adjudicate the trust issues (ECF No. 11 at 12). Because, by all accounts, both forums are adequate, this factor is neutral. *Jackson-Platts,* 727 F.3d at 1143; *Ambrosia Coal*, 368 F.3d at 1334.

In sum, as in *Jackson-Platts,* "none of the six *Colorado River* factors compel abstention." 727 F.3d at 1143. "If anything, most tip in the opposite direction." *Id.* The district court's finding that four of the *Colorado River* factors favored abstention was clearly erroneous.

The district court had a "virtually unflagging duty" to exercise its jurisdiction over the Trustee Lawsuit, and it failed to do so. *Id.* at 1140. Its decision to abstain and remand the case therefore constituted an abuse of discretion. Absent the "rare and exceptional circumstances found in *Colorado River,*" the court was "obliged to exercise its jurisdiction over this case." *Id.* at 1143. This Court should reverse the Remand Order and send the matter back to the district court for further proceedings. *Id.*

## II.

## THE DISTRICT COURT ERRED BY REMANDING INSTEAD OF STAYING THE FEDERAL CASE

Even assuming *Colorado River* abstention had been appropriate—which it plainly was not—the district court's Remand Order cannot stand. The court reversibly erred by remanding the Trustee Lawsuit to state court. Well-settled law dictates that when a federal court abstains under *Colorado River*, the proper procedural remedy is a stay or, in some instances, a dismissal—not a remand. *Moses H. Cone,* 460 U.S. at 28.

Although the Supreme Court has not expressly favored a stay over dismissal, this Court—and the overwhelming majority of other Circuits addressing this issue— have made clear that a stay is the appropriate course when deferring to a parallel state proceeding under *Colorado River*:

> We now join our sister circuits in holding that "a stay, not a dismissal, is the proper procedural mechanism for a district court to employ when deferring to a parallel state-court proceeding under the Colorado River doctrine."

*Moorer*, 374 F.3d at 998 (quoting *LaDuke v. Burlington N. R.R. Co.,* 879 F.2d 1556, 1561-62 (7th Cir. 1989)).[7]

---

[7] *Accord LeChase Constr. Servs., LLC v. Argonaut Ins. Co.,* 63 F.4th 160, 173 n.7 (2d Cir. 2023); *Montanore Minerals Corp. v. Bakie,* 867 F.3d 1160, 1166 (9th Cir. 2017); *Saucier v. Aviva Life & Annuity Co.,* 701 F.3d 458, 465-66 (5th Cir. 2012); *Jimenez v. Rodriguez-Pagan,* 597 F.3d 18, 31-32 (1st Cir. 2010); *Bates v. Van Buren Twp.,* 122 Fed. App'x 803, 809 (6th Cir. 2004); *LaDuke,* 879 F.2d at 1561-62.

33

Here, however, the district court improperly granted remand at Plaintiff's request (ECF No. 11 at 1, 13; ECF No. 14 at 5). In doing so, the court first found that the Trustee Lawsuit is essentially the same action as the PR Petition (i.e., that the two are "parallel actions") such that resolution of the PR Petition would determine the outcome of the Trustee Lawsuit, and then sent the Trustee Lawsuit back to state court where, according to the district court, no additional facts or legal issues would require litigation. This ruling is not only legally untenable, it defies logic.

The district court's decision to remand directly contravenes both Eleventh Circuit law and the district court's own prior rulings, in which it correctly stayed cases under *Colorado River* rather than remanding them.[8] A stay is the only procedural mechanism that preserves the litigant's statutory right to a federal forum, avoids potential statute-of-limitations issues, and promotes judicial efficiency by keeping the matter before the same federal judge. *See Moorer,* 374 F.3d at 998; *LaDuke,* 879 F.2d at 1562.

Especially in a case that was properly removed to federal court, remand is

---

[8] *See, e.g., Willson,* 2016 WL 8943333 at *6 (granting abstention, ordering stay, and allowing reopening after resolution of state matter); *Brown v. Blue Cross & Blue Shield of Fla., Inc.,* 2011 WL 11532078, at *12 (S.D. Fla. Aug. 8, 2011) (same); *Beekman v. Indymac Fed. Bank,* 2013 WL 12124623, at **4-5 (S.D. Fla. Feb. 15, 2013) (same).

34

not—and never has been—an available remedy under *Colorado River.* As the Fifth Circuit explained in *Saucier*, 701 F.3d at 465, remand in this context is "not an option." It has no basis in statute or case law, and is, in the court's words, "simply illogical." *Id.* Once a federal court determines that a parallel state proceeding exists, "no purpose is served" by sending a properly removed federal case "back to state court to litigate the same issues." *Id.* at 465-66.

Other courts have reached the same conclusion. *See, e.g., Burke v. Radiant Logistics Global Servs., Inc.*, 2008 WL 2094919, at \*5, \*5 n.5 (E.D. Mich. May 16, 2008) (denying the plaintiff's request to remand removed case and staying case instead; observing that stay would ensure that the out-of-state *defendant's* preference for federal forum is not unduly disturbed; noting that neither the plaintiff nor the court could identify a single case in which *Colorado River* abstention resulted in remand); *Ambrose v. New England Ass'n of Sch. & Colls., Inc.,* 100 F. Supp. 2d 48, 49 n.1 (D. Me. 2000) ("The Court has no power to remand under *Colorado River,* which allows courts to stay or dismiss certain actions in exceptional circumstances.").

Thus, even if *Colorado River* abstention had been warranted (which it was not), the district court's decision to remand the Trustee Lawsuit was legal error. *Moorer,* 374 F.3d at 998; *Saucier,* 701 F.3d at 465-66. This departure from established law stripped Appellants of their statutory right to a federal forum in a

properly removed case. A stay of the federal action was the only legally permissible outcome. For this reason alone, the Remand Order must be reversed.

## **CONCLUSION**

The district court abused its discretion by declining to exercise jurisdiction over the Trustee Lawsuit under the *Colorado River* abstention doctrine. The Trustee Lawsuit and PR Petition are not parallel proceedings, and no exceptional circumstances justify abstention. The court compounded its error by remanding the federal case rather than staying it, contrary to established precedent. This Court should reverse the Remand Order and remand with instructions to reinstate the federal action. At a minimum, Appellants are entitled to a stay of the federal proceedings pending resolution of the probate matter in state court.

Date: July 15, 2025

Respectfully submitted,

**HOLLAND & KNIGHT LLP**
*Counsel for Appellants*

By: */s/* Ilene L. Pabian
Ilene L. Pabian, Esq.
Florida Bar No. 62499
Christopher N. Bellows, Esq.
Florida Bar No. 512745
ilene.pabian@hklaw.com
christopher.bellows@hklaw.com
701 Brickell Avenue, Suite 3300
Miami, FL 33131
Tel: 305-374-8500
Fax: 305-789-7799

Brian H. Koch, Esq.

Florida Bar No. 637335
brian.koch@hklaw.com
515 East Las Olas Boulevard, Suite 1200
Fort Lauderdale, Florida 33302
Tel:  954-525-1000
Fax: 954-463-2030

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the word limit of Fed. R. App. P. 32(a)(7)(B)(i) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and 11th Cir. R. 32-4, this document contains 8,230 words.

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman font.

/s/ Ilene L. Pabian
Ilene L. Pabian

37

# **CERTIFICATE OF SERVICE**

I hereby certify that on July 15, 2025, I electronically filed the foregoing with the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system, which will send a notice of electronic filing to counsel of record.

/s/ Ilene L. Pabian
Ilene L. Pabian

**INDEX TO ADDENDUM**

| Title | Dated | Tab No. |
| --- | --- | --- |
| Amended Order on Petition to Determine Incapacity, Petition to Revoke Declaration of Preneed Guardian and Petition to Appoint Guardian for Lucille Rubin | March 22, 2023<br><br>Palm Beach County Circuit Court; Case No. 2022MH001380 | ADD 1 |
| Omnibus Order | October 18, 2023<br><br>Southern District of Florida; Case No. 9:21-CV-82014-MARRA | ADD 2 |
| Final Judgment and Order on Competing Petitions for Administration | December 22, 2023<br><br>Palm Beach County Circuit Court; Case No. 2021CP001979 | ADD 3 |
| Order Granting Rehearing and Amended Final Order Granting Lucille Rubin's Second Motion to Compel Partial Distribution | May 9, 2025<br><br>Palm Beach County Circuit Court; Case No. 50-2021CP001979 | ADD 4 |

# ADD 1

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL
CIRCUIT IN AND FOR PALM BEACH COUNTY, FLORIDA

IN RE:                                           CASE NO. 2022MH001380XXXXSB

GUARDIANSHIP OF:                                 DIVISION: IZ
LUCILLE RUBIN,

An alleged Incapacitated Person.

_____/

**AMENDED ORDER ON PETITION TO DETERMINE INCAPACITY, PETITION TO
REVOKE DECLARATION OF PRENEED GUARDIAN AND PETITION TO APPOINT
GUARDIAN FOR LUCILLE RUBIN**

**THIS CAUSE** came before the Court pursuant to § 744.3201 Florida Statutes upon the filing of a Petition to Determine Incapacity on May 13, 2022 by Ronald Rubin alleging that his mother, Lucille Rubin, was incapacitated.  On November 11, 2022, Ronald filed a Petition to Revoke Declaration of Preneed Guardian pursuant to § 744.3045.  The Declaration was dated April 21, 2021 and Lucille designated her daughter, Roberta, to be her Preneed Guardian.

As a factual basis, Ronald alleged Lucille's lack of capacity.  He also alleges undue influence by Lucille's daughters Roberta and Randi contending that they actively procured the declaration, that Roberta and Randi have isolated their mother since their father Walter died on April 11, 2021 and that Roberta and Randi are unqualified to serve as Guardians.

On December 14, 2022, Ronald filed a Verified Motion to Suspend Authority Granted to Roberta and Randi by Lucille's Durable Power of Attorney pursuant to § 744.3203 setting forth a factual basis for the motion.

Counsel for Ronald Rubin has filed a Motion for Clarification on March 13, 2023.  On February 24, 2023, the Court entered an Order on Miscellaneous Matters Not addressed by the Court.  In the Order, the Court erroneously ordered counsel for Roberta to "submit the appropriate

Page 1 of 22

**003936**

orders to the Court".  To be clear, consistent with the Court's Order dated February 19, 2023 (DE# 51) there are no orders necessary to submit to the Court.  Accordingly, the Court enters this Amended Order.

Ronald Rubin, the Petitioner, is represented by Charles Weiss, Esquire and James Telepman, Esquire.  Lucille Rubin, the AIP, is represented by Peter Sachs, Esquire and Roberta Lehrman, the designated Preneed Guardian, is represented by Mark Bideau, Esquire.  By agreement of the parties, the Court will be consider all matters raised during this five-day bench trial held January 30, 2023 through February 3, 2023.

## Introduction

The Court first wishes to commend counsel on their professionalism and the cooperation they displayed during this five-day trial. In making findings of facts and conclusions of law in this case, the Court has carefully considered, compared, and weighed all of the evidence including the exhibits accepted into evidence.  The Court has observed the candor and demeanor of the witnesses and determined their credibility. The Court has resolved all of the conflicts in the evidence.

In making the Court's determinations, the Court has attempted to distill the testimony and salient facts together with the findings and conclusions necessary to find a resolution of this case. In summarizing the substance of the witnesses' testimony, the Court has not included every detail of their testimony, nor attempted to state non-essential facts; however, because the Court has not done so, does not mean that it did not consider it.

## Family History & Estate Plan

Walter and Lucille were married for more than 60 years having married in 1958.  They had four children, daughters Roberta Lehrman and Randi Barrett and sons Ronald and Richard Rubin. Until 2018 or 2019, Walter and Lucille made no provision in their estate plan for any of

the children. Instead, their assets would be used for the surviving spouse and upon the last to die, would pass to their charitable foundation.

The evidence showed that Randi has not had much of a relationship with either parent for many years, Walter and Lucille considered Richard as an unsuccessful writer living in Maine, Roberta had issues apparently due to her inability to get over the death of her only child, and Ronald was the attorney whom Lucille described as very smart, but a problem child and untrustworthy.

This case is the second Petition to Determine Incapacity that Ronald filed. The first case was filed on May 11, 2021. The Court entered an Order of Dismissal on June 17, 2021 after two of the examining committee members found that Lucille was not incapacitated. Ronald appealed the dismissal order but it was affirmed by the Fourth District Court of Appeal by Mandate dated May 27, 2022 in Case No. 4D21-1963.

Before Walter was ill, Ronald would see them more often in Florida after the pandemic. Towards the last few months prior to Walter's death, Ronald was the primary child spending time with his parents. Richard would call often and talk to his father but Roberta and Randi were not around. In early March, 2021, Walter & Lucille were upset with Chuck Rubin purportedly due to the high fees being charged. They hired lawyer Abe Mora to change their long standing estate documents making Ronald as DPOA, personal representative, and put him on the board of their charitable foundation. The Rubin estate is valued at approximately $80 million dollars.

**Facts and Testimony Presented**

Josimar Saldana, Ph.D. examined Lucille on June 20, 2022 at her home in Palm Beach Gardens, Florida. She noted Lucille's mental diagnosis as Mild Neurocognitive Disorder Possible Alzheimer's Disease, Unspecified Depressive Disorder (by history). She noted that "Ms. Rubin

Page 3 of 22

**003938**

is not able to make informed decisions regarding financial, or medical/mental health affairs due to memory loss and periods of confusion." She opined that Lucille is incapacitated and that a limited Guardianship is appropriate with Lucille retaining the right to vote, determine her own residence, and to make decisions about her social environment.

Stephanie Cheshire, MSW examined Lucille on June 22, 2022. She opined that Lucille is vulnerable and her physical and financial safety is at risk if left to function on her own. She opined that a plenary Guardianship is appropriate.

William S. Otto, MD examined Lucille on July 27, 2022. Dr. Otto noted that he concurred with the other physician's diagnosis of Alzheimer's Disease and stated that Lucille had been treated for the condition prior to her husband's death and that since he passed his strong leadership is gone as well. He opined that Lucille is incapacitated and that a limited Guardianship is appropriate with Lucille retaining the right to vote.

Dr. Robert Wacks testified that he has practiced internal medicine in West Palm Beach for over forty years. Lucille and Walter were patients of his and he first saw Lucille on February 19, 2019. Lucille continued to see him for a short time after Walter's death. He diagnosed Lucille with Alzheimer's Disease on July 22, 2019 and on December 5, 2019 wrote a letter stating that Lucille's Alzheimer's Disease was progressing and noted that "she is not competent to manage her affairs or medical decisions."

Sandra Alvarez had been with Walter and Lucille starting as a cleaning their apartment and she eventually became a certified nurse assistant and helped care for Lucille. She testified about the family circumstances around the time of Walter's death in April 2021. She described Ronald as a caring and supportive son and described how he would sit all day and do puzzles with Lucille and talk to her. There was no doubt that Sandra was on "Team Ronald" as she continues to

communicate with him even though she no longer cares for Lucille. Later in the trial, there was testimony that Sandra was terminated because she was continuing to provide Ronald with information after the flurry of litigation began.

Ronald Rubin testified that he came to Florida in early March, 2021. After spending the first night or two at Roberta's home, he stayed at an apartment at Devonshire. He spent almost every day with his parents doing puzzles with his mother or talking with his father. Walter spent most of his time in a bed, first at the hospital and then at home. Ronald testified that he initially came to Palm Beach Gardens from his home in Washington, D.C. to visit with his father for his birthday in early March 2021. Ronald understood his father was preparing to go to the hospital for routine tests, but the tests were followed by swallowing problems, pneumonia, and later his death. Ronald testified to his constant presence with his father at the hospital, staying with his father alone for substantial periods of time each day and sometimes staying overnight. According to Ronald, Walter wanted him to find a couple of lawyers that he could interview because he wanted to get rid of Charles Rubin because his fees were too high. He found Abe Mora through an old friend and Abe Mora wound up meeting Walter when he was in the hospital. Ronald stated that he never influenced his father to change his estate documents and that the decision to fire Charles Rubin and hire Abe Mora was made solely by his father.

Ronald testified that he has been having difficulty speaking to his mother since this litigation began and believed that his calls were being blocked. The Court did hear a recorded telephone conversation between Lucille and her sons, Ronald and Richard. Apparently, Ronald called his mother and she picked up the telephone. Ronald then got Richard to join the call and Richard had recorded the phone call. This conversation took place on December 30, 2021. The

Page 5 of 22

**003940**

Court heard an intelligent and logical woman discuss and even debate significant personal issues with her sons.

There was nothing discussed as to a personal nature between Ronald and Richard, no questions as to how their mother was doing. Instead, her sons were determined to keep telling her over and over that she needed to get rid of Chuck Rubin and see another lawyer.

Abe Mora is a lawyer who practices in the area of estates and trusts. He testified that he was contacted by Walter Rubin while he was in the hospital. During the first meeting at the hospital, they primarily just talked and Walter indicated that he would think about hiring him. Ultimately, Mr. Mora was hired and he prepared will and trust documents for Walter and Lucille. The documents were executed on March 22, 2021. Walter had made a substantial change in his long-term estate plan that his children not be involved in the charitable foundation. Here, Walter increased the Trusts for three of his children, designated Ronald as their preneed guardian, durable power of attorney (DPOA), and health care surrogate and put Ronald on the charitable foundation board. In addition, the beneficiaries, Ronald, Richard, and Roberta, were to receive financial benefit upon the first of Walter or Lucille to die which increased the Rubin tax burden significantly. Both Walter and Lucille signed these documents in their home. Abe Mora testified that Ronald was not present in the room when the documents were signed by Walter and Lucille.

Dr. Paayal Patel, M.D. is a neurologist employed at Brain Matters. Lucille has been participating at Brain Matters, a company that conducts pharmaceutical research for patients with Alzheimer's. The patient is frequently interviewed during the process. Notes from some time after Walter died, which were run in April or May 2021 and reflect that Lucille had consented to Sandra Alvarez as being the reporter and opined that Lucille could understand who she could trust to care for her. Dr. Patel testified that Lucille had the capacity to understand and provide informed

consent to participate in the Brain Matters trials through November 29, 2021, when she last signed a written consent form.

Jill Watson testified that she is Lucille's current CNA.  She testified that she worked for the Rubin's prior to Sandra Alvarez but that she was terminated by Ronald Rubin after he accused her of stealing Lucille's charm bracelet (Which was later found by Ronald).  She testified about Lucille and her relationship with her daughter Roberta.  While Sandra was on "Team Ronald", Jill is clearly on "Team Roberta".   Jill currently works for Lucille Monday thru Friday for a 24-hour shifts.  On the weekend, she will either drive Lucille to Roberta's in Delray Beach or Roberta will pick up Lucille and take Lucille to spend the weekends with her at her home.

On May 10, 2021, Benjamin Bensadon, Ed.M, Ph.D, examined Lucille via Zoom to determine whether or not she had testamentary capacity.  He was retained by Lucille's lawyer, Charles Rubin, prior to her executing her will and estate documents.  Although he noted short-term memory impairment, he opined that Lucille had testamentary capacity.   Once again, it is important to note that an Order of Dismissal was entered on June 17, 2021 in the first guardianship case after two of the examining committee members found Lucille to not be incapacitated.

Charles Rubin (no relation) testified that he is a board certified estate planning attorney and that he had been Walter and Lucille's estate lawyer since 2018.  He testified that Walter was very sharp when it came to his assets.  He estimated that when he first met Walter and Lucille their estate was worth approximately 40 million dollars and it doubled to 80 million dollars.  He testified that he had prepared estate documents for Walter and Lucille.  Eventually, they provided for trusts for Ronald, Richard and Roberta but continued to exclude Randi from their estate plan.

His history with Walter and Lucille dated back to 2017.  In 2017, Walter established a six million dollar trust for Roberta and excluded the other three children.  In 2018, he created a trust

for all of the children except Randi for $2.5 million each.  In 2019, he changed the amounts to five million for Roberta and $5.1 million for Ronald and Richard.  In February, 2021, Lucille declined to serve under Walter's DPOA and allowed Steve Tubbs (accountant) to serve due to Walter's impairment. He noted that he was terminated from representing Walter and Lucille and that the stated reason was the amount of fees charged.  He testified that he had first met Ronald Rubin during a conference with Walter wherein Ronald was questioning the need for a trust and suggesting to his father that he leave the money outright.

Mr. Rubin testified that he was concerned about Walter's impairment and noted that Ronald had told him the he was on medication.  He also testified that Walter would often mention Lucille's short-term memory issues during their conversations.  Finally he testified that Ronald's conduct was concerning to him and he felt that many of the undue influence boxes were being checked by Ronald.

Shortly after Walter's death, he received a telephone call from Roberta and met with Roberta, Randi and Lucille.  Apparently, Lucille had discovered that she had signed documents prepared by Mr. Mora that allowed Ronald to "control her life" and that she did not want that.  Mr. Rubin was surprised that the Mora documents had substantially changed Walter and Lucille's estate plan by putting Ronald on the foundation board and designating him as their DPOA.  In addition, the Mora documents created a substantial tax burden, something that Walter would never have wanted.  Mr. Rubin did not hide his feelings that he believed Ronald was unduly influencing his father.  He testified that he was not concerned about Roberta's motivation because she actually benefitted by the Mora documents.  Setting those documents aside was not in her financial best interest.

003943

Things got hectic around April 21, 2021 that involved the Delray Beach Police Department, Palm Beach Gardens Police Department and Department of Children & Families (DCF). According to Mr. Rubin, he prepared documents for Lucille. In the first trust amendment executed on May 10, 2021, Lucille provided for an equal distribution of her estate to her four children. Ironically, Ronald filed his first petition to determine incapacity on May 11, 2021. Lucille was very upset about this and executed an amendment to her restated trust wherein it states the following:

> "I have intentionally omitted RONALD RUBIN and his descendants from these dispositions because of his having filed a petition to have me declared incompetent in May, 2021, and RICHARD RUBIN and his descendants because of his siding with and/or supporting RONALD RUBIN in regard to such petition"

Roberta Lehrman testified that she lives in Delray Beach, Florida. She indicated that she did not have a very close relationship with her parents especially after the death of her 24 year-old son. Her father was the type of man that if you did not need him, he did not need you. He felt that Roberta needed to get on with her life and she was not ready to do that. She described her mother as typical for their generation. Her father made all of the financial decisions and her mother went along with it. She noted that she has been very close with her sister Randi, who has had very little to do with her parents. She added that Randi and her husband are very successful and she did not need her father's control.

Roberta testified that Ronald stayed with her for a night or two when he came to Florida in March 2021. After he moved to a hotel or apartment at Devonshire, he was with their parents every day. Roberta assumed that he was helping Lucille and Walter and she was happy about that. After the family returned from New York for Walter's funeral, things started to fall apart. First, Ronald sent her a picture of Lucille's charm bracelet that he found. This was the one he had accused Jill of stealing it. When Roberta told Ronald to give it to Lucille and that she will be so

happy, he responded that he had all the jewelry and he was safe keeping it.  Lucille then asked Ronald about the papers she had signed with Abe Mora and wanted to know about Walter's estate at which point Ronald responded that it was like a baby and needed time to grow.

Roberta and Lucille (maybe Randi) went to Abe Mora's office to get a copy of Walter's estate papers.  While they would not give Lucille Walter's papers, they did give her a copy of Lucille's papers, which they assumed would be a mirror image.  This was the first time Lucille learned that Ronald was now her preneed guardian and was on the foundation board.  According to Roberta, they contacted another lawyer who was too busy to take their case but suggested that they go back to Chuck Rubin.

Roberta, Randi and Lucille met with Chuck Rubin.  When he discussed changing Lucille's documents, he was with Lucille alone.  Roberta agreed to be the preneed guardian, health care surrogate and DPOA.  The documents were later changed to include Randi as co-guardian.  She described that her mother has been very happy.  She has her CNA Jill Monday thru Friday on 24-hour shifts and spends the weekend at Roberta's in Delray Beach.  Roberta indicated that her mother enjoys coming to Delray Beach because Lucille and Walter had lived in Delray Beach for forty years before moving to Devonshire.  She testified that they go shopping and to happy hour and her mother appears happy.  In addition, she testified that Randi is in charge of making all of her medical appointments and is great at getting them quickly.

### **Incapacity**

Based upon the evidence presented and the testimony and uncontradicted reports of the examining committee members, the Court has no choice but to find that Lucille Rubin is incapacitated.  Based upon the evidence and testimony, the Court finds that a limited guardianship would be appropriate and that Lucille shall retain the following rights:

- The right to vote
- The right to determine her own residence
- The right to make decisions about her social environment.
- The right to travel with assistance.

In consideration of the findings of the Court, the Court finds that there are lesser restrictive alternatives to a guardianship executed by Lucille on April 21, 2021 nominating Roberta as her preneed guardian, health care surrogate and DPOA.  Notwithstanding, on December 14, 2022, Ronald filed a Verified Motion to Suspend Authority Granted to Roberta and Randi by Lucille's Durable Power of Attorney pursuant to § 744.3203 setting forth a factual basis for the motion.

The parties stipulated that upon a finding of incapacity, the Court will consider the validity of the lesser restrictive alternatives.   Ronald has alleged that they are invalid due to Lucille's lack of capacity, undue influence by her daughters Roberta and Randi in that they actively procured the declaration, and that they have isolated their mother since their father Walter died on April 11, 2021.  Finally, Ronald alleges that his sisters, Roberta and Randi, are unqualified to serve as Guardians.

**<u>Lucille's Capacity on April 21, 2021 to Execute</u>**
**<u>Lesser Restrictive Documents</u>**

In the first petition to determine incapacity filed by Ronald, two of the examining committee members determined that Lucille was not incapacitated.  Marsha Jackson, the lay-person on the committee, examined Lucille on June 3, 2021 and determined that she was not incapacitated.  Dr. Stanley Bloom, M.D. examined Lucille on June 2, 2021 and noted that she was able to handle her own money and found that she could manage or dispose of her own property.

There are few Florida cases on the capacity necessary to execute preneed documents. According to one Florida court, the test for capacity to execute Advanced Directives is whether the ward had the capacity to generally understand the nature of the decision she is making and its

Page 11 of 22

**003946**

implications." *Koshenina v. Buvens*, 130 So. 3d 276, 280 (Fla. 1st DCA 2014). The *Koshenina* Court also states that the test:

> "is analogous to that used in the context of testamentary capacity cases, which requires that a testator understand in a general way the nature and extent of his property to be disposed of, the testator's relation to those who would naturally claim a substantial benefit from his will, and the effect his disposition will have.

*Koshenina* at 280 (quoting from *In re Estate of Edwards*, 433 So. 2d 1349, 1350 (Fla. 5th DCA 1983). It has long been public policy in Florida that the right to dispose of one's property by will is highly valuable and it is the policy of the law to hold a last will and testament good wherever possible. *In re Weihe's Estate*, 268 So.2d 446, 451 (Fla. 4th DCA 1972). The *Weihe's Estate* court noted "[a] testator may still have testamentary capacity to execute a valid will even though he may frequently be intoxicated, use narcotics, have an enfeebled mind, failing memory, [or] vacillating judgment." Id. at 448. In the case of *In re Dunson's Estate*, 141 So.2d 601, 604 (Fla. 2d DCA 1962), the court pointed out that to execute a valid will, the testator need only have testamentary capacity (i.e. be of "sound mind"). This has been described as having the ability to mentally understand in a general way (1) the nature and extent of the property to be disposed of, (2) the testator's relation to those who would naturally claim a substantial benefit from his will, and (3) a general understanding of the practical effect of the will as executed. Id.

The Court finds that Lucille was well aware of what she was signing on April 21, 2021, and May 4, 2021. In addition to the other evidence, the lawyers presiding over her execution of documents on those dates felt that Lucille understood them and signed them, knowingly, willingly and understanding their consequences. This finding is supported in part by the testimony from several witnesses regarding Walter's controlling personality and Lucille's deference to him. All those who dealt with both Walter and Lucille testified that, especially with

financial and legal issues, while Lucille would let her wishes be known, Walter was the leader and, as in many "old-fashioned" marriages, Lucille deferred to Walter.  As Lucille stated herself, "I don't ask him (Walter) about his business and he doesn't ask me what is in the refrigerator."

### Undue Influence –Lesser Restrictive Alternatives

The same framework for analysis applies in evaluating undue influence in the formation of wills and trusts *See In re Carpenter's Estate*, 253 So. 2d 697 (Fla. 1971) (establishing framework in context of wills); *Newman v. Brecher,* 887 So. 2d 384, 386 (Fla. 4th DCA 2004) (applying *Carpenter* to trusts).   "Undue influence comprehends overpersuasion, coercion, or force that destroys or hampers the free agency and will power of the testator." *Newman v. Smith*, 82 So. 236, 246 (1918). The doctrine of undue influence is based on the theory that the "testator [was] induced by various means, to execute an instrument which, although his in outward form, is in reality not his will, but the will of another person which [has been] substituted for that of testator." *In re Winslow's Estate,* 147 So.2d 613, 617 (Fla. 2d DCA 1962).

The Supreme Court of Florida established a framework for evaluating undue influence claims in *In re Carpenter's Estate*, 253 So. 2d 697 (Fla. 1971).  First, a presumption of undue influence arises upon a showing that a party (1) occupied a confidential relationship with the testator, (2) was a substantial beneficiary under the will, and (3) was active in procuring the instrument. *See Carpenter v. Carpenter (In re Estate of Carpenter)*, 253 So.2d 697, 701 (Fla.1971); *Estate of Brock*, 692 So. 2d 907, 911 (Fla. 1st DCA 1996).  As can be seen from the plethora of cases dealing with undue influence, establishing this presumption is fact intensive. This is particularly true in relation to the element of active procurement.  In *Carpenter*, the Supreme Court provided a nonexclusive list of criteria which are relevant to determining whether a beneficiary has been active in procuring a will. *Carpenter*, 253 So.2d at 702. Will contestants are not "required

to prove all the listed criteria to show active procurement." *Id.* Indeed, "it will be the rare case in which all the criteria will be present." *Id.*

Here, the Court finds the evidence is clear that Roberta and Randi had developed a close relationship with their mother.  Once Walter died, Lucille was now free to renew a relationship with her daughters.  The Court believes that from the evidence Walter was a controlling husband to the extent that Lucille signed whatever documents Walter wanted her to sign.  The Court also finds credible Roberta's testimony that one week after Walter's death her mother appeared surprised that Ronald was her appointed fiduciary.  The Court concedes that this could be attributed to Lucille's poor short-term memory.  However, the Court finds it more reasonable that she was not paying much attention to the documents she had signed with Abe Mora and deferred to Walter's judgment.  Abe Mora testified that the conversations over the drafting of the documents prior to their preparation were conducted solely with Walter.

In consideration of the claim of undue influence in the signing of the lesser restrictive documents, the Court has considered the following *Carpenter* factors:

    a.  ***Presence of the beneficiary at the execution of the will***

    b.  ***Presence of the beneficiary on those occasions when the testator expressed a desire to make a will***

    c.  ***Recommendation by the beneficiary of an attorney to draw the will***

    d.  ***Knowledge of the contents of the will by the beneficiary prior to execution***

    e.  ***Giving of instructions on preparation of the will by the beneficiary to the attorney drawing the will***

    f.  ***Securing of witnesses to the will by the beneficiary***

    g.  ***Safekeeping of the will by the beneficiary subsequent to execution***

If the evidence rebuts the presumption of undue influence, or if the presumption never arises in the first place, it becomes the role of the trial court to determine, by the greater weight of the evidence, whether the facts support a finding of undue influence based on all of the evidence. *See Sun Bank/Miami, N.A. v. Hogarth*, 536 So. 2d 263, 267 (Fla. 3d DCA 1988). Ultimately, the [undue] influence must amount to over persuasion, duress, force, coercion, or artful or fraudulent contrivances to such an extent that there is a destruction of free agency and willpower of the testator." *Levin v. Levin*, 60 So. 3d 1116, 1118 (Fla. 4th DCA 2011) *quoting Raimi v. Furlong*, 702 So.2d 1273, 1287 (Fla. 3d DCA 1997).

In this case, the evidence presented does not support a finding that undue influence occurred.  Courts have recognized that merely having a close parent child relationship is not enough to show undue influence. *Estate of Kester v. Rocco*, 117 So.3d 1196 (Fla. 1st DCA 2013). Likewise, the acts of dutiful children in providing helpful information and advice, even on the topic of estate planning, is not undue influence. *See Carter v. Carter,* 526 So. 2d 141, 143 (Fla. 3d DCA 1988).

In *Derovanesian v. Derovanesian,* 857 So.2d 240 (Fla. 3d DCA 2003), the court considered an undue influence claim when the most recent estate plan was a significant change from prior estate plans that divided the estate equally between the four siblings.  Four months prior to her death, the decedent amended her 2.3 million dollar estate plan by leaving each son $75,000 and the rest to her daughter, Mary.  The brothers relied on *Carpenter* inferences to the effect that Mary helped her mother secure an attorney, was present when the document was executed, and was aware of the contents both before and after execution.  The court noted that the decedent was an indomitable, fiercely independent individual, who was peculiarly unsusceptible to the influence of others.  In addition, the court considered the testimony of the drafting attorney and the testimony

of witnesses who stated that the decedent had expressed to them what she was going to do with her estate.    The evidence shows that Roberta and Randi's actions do not rise to the level of over persuasion, duress, force, coercion or fraudulent contrivance.

At the time that Lucille learned about the Mora documents, Roberta actually benefitted more from those documents than any previous will executed by her parents.  Her trust had doubled from five million to ten million dollars.  Moreover, the Court finds credible the testimony that Lucille was not happy to learn that Ronald would be controlling her life and that she felt like he had been holding her prisoner.   This Court finds that Lucille had the requisite capacity and was free from undue influence when she executed the Advanced Directives on April 21 and 22, and May 4, 2021.

<b><u>Lesser Restrictive Alternatives to Guardianship</u></b>

§ 744.331(6)(b), Fla. Stat. states that when a court determines that a party is incapacitated, it "must consider and find whether there is an alternative to guardianship that will sufficiently address the problems of the incapacitated person. A guardian may not be appointed if the court finds there is an alternative to guardianship which will sufficiently address the problems of the incapacitated person…."  This is in keeping with the clear intention of the legislature, expressed in § 744.1012, Fla. Stat., for the courts to always seek the least restrictive and least intrusive alternatives in protecting the assets and interests of the incapacitated person.

An issue was raised prior to the trial and during the trial in reference to Lucille's finances. Ronald claimed that if Lucille was paying for her daughters' legal fees or other things that would somehow disqualify Roberta from serving as a preneed guardian.  The Court had indicated during the trial that it was not concerned if Lucille had paid for her daughter's attorney fees or the cost of accompanying Lucille on vacations, such as when Roberta travelled with her to Italy and Israel.

Page 16 of 22

<b>003951</b>

The Court was also not concerned if Lucille or Walter paid for any of their children's legal fees. For example, there was testimony that Walter and Lucille had given Ronald close to one million dollars for his legal fees in suing the State of Florida for his alleged wrongful termination. There was some suggestion that Ronald actually came to Florida in March 2021 to seek additional funds since he lost his case and it was on appeal.

During Roberta's testimony, it was disclosed that in December 2021, Lucille made a year-end gift of five million dollars each to Roberta and Randi. The Court is mindful that it is generally inappropriate for a fiduciary to accept a gift from its principal, and the giving of these gifts may raise red flags. However, this is not a situation involving an unrelated third-party fiduciary. Rather, the designated preneed guardian is the daughter of the principal. Roberta testified that during a meeting with her financial advisor at Wells Fargo, the gifts were suggested as advances on their inheritance by Lucille's financial advisor for estate and tax planning reasons. Roberta testified that neither her nor Randi ever suggested anything to their mother. Further, after Lucille's financial advisor suggested that Lucille make these lifetime exclusion gifts, Lucille told her advisor that she would think about it and addressed the issue with her estate tax counsel, Charles Rubin and her CPA, Steve Tubbs, to determine the amount that she could safely gift. It was only after their analysis was completed and they both expressed that it was okay that these gifts were made.

The Court also notes that the gifts were merely advances on the monies that Randi and Roberta will inherit from Lucille upon her death as the sole residuary beneficiaries under Lucille's estate plan. Roberta also testified that in the event her mother needs additional funds, Roberta would provide these funds to her mother. Roberta has not touched the funds to date, and she testified that she has no intention of touching the money during her mother's lifetime. The Court finds no reason to discredit her testimony and finds that Roberta's interest in serving as her

mother's fiduciary does not arise from self-interest.  The Court has presided in South County for many years and notes that it is common for wealthy individuals to make gifts for tax purposes and there is no evidence that this tax strategy has caused any financial harm to Lucille.

The Court will not appoint a guardian of Lucille's person and property as there are lesser restrictive alternatives that satisfy her best interests and address Lucille's challenges. The Designation of Healthcare Surrogate and Durable Power of Attorney executed by Lucille Rubin on April 21, 2021 and May 4, 2021, respectively, are lesser restrictive alternatives and shall continue in full force and effect.

In this case, the Court finds that the lesser restrictive alternatives are sufficient to protect the person and property of Lucille.  However, even if the Court did not make that finding the Ward competently designated Roberta as her preneed guardian on April 21, 2021.  Thus, even if a guardian was needed, which is not the instant case, this Court must give deference to that designation in determining whether Roberta is entitled to serve.  Production of the Preneed Guardian in this proceeding constitutes a rebuttable presumption that the preneed guardian, Roberta, is entitled to serve as guardian. See § 744.3045(4), Fla. Stat. The rebuttable presumption may only be overcome by substantial, competent evidence. *Acuna v. Dresner*, 41 So. 3d 997, 1000 (Fla. 3d DCA 2010). "This designation is one of life's most intimate and important decisions involving highly personal and private judgments about who will provide care, love, and support when persons are unable to do so for themselves." *Koshenina,* 130 So. 3d at 282. The rebuttable presumption creates a hurdle to show how specific actions/inactions of the designee are "sufficiently egregious" as to be contrary to the best interests of the ward. Id. at 283.

Florida's guardianship framework is designed to respect and honor the alleged incapacitated person's or ward's wishes to the greatest extent possible. See § 744.312(3)(a), Fla.

Stat. ("[t]he court shall also consider the wishes expressed by an incapacitated person to who shall be appointed guardian"); see also *Estate of Salley v. Comprehensive Pers. Care Servs. Inc.*, 742 So. 2d 268 (Fla. 3d DCA 1997) ("[w]here a ward's preference as to the appointment of a guardian is capable of being known, that intent is the polestar to guide probate judges in the appointment of their guardians.")

### Is Roberta Qualified to Serve as Guardian

Lucille's fulltime CNA Jill Watson testified that she provides 24-hour care five days a week and Roberta cares for her mother fulltime on the weekends. Roberta is an experienced caregiver who provided care to her son while he battled cancer. Roberta also utilizes the services and skills of her younger sister Randi to help ensure that Lucille gets all of her appointments promptly and has all the care and services she needs. Lucille has a primary care physician and visits Brain Matters regularly for monitoring her Alzheimer's disease. Lucille is compliant with taking her medication and sees other doctors as needed. In short, Roberta has established a structure to ensure that Lucille is well cared for and protected.

Prior to reconnecting with her daughters, Lucille was spending most of the day in her apartment and only leaving for a doctor's appointment or an appointment at Brain Matters. Even when Ronald was visiting Walter and Lucille for almost a month, Ronald sat in the apartment with Lucille doing crossword puzzles. The evidence showed that Roberta has given Lucille a social life. Lucille loves spending the weekends at Roberta's in Delray Beach because she used to live in South County for many years with Walter before selling their home. They go to restaurants and shopping together and Lucille enjoys going out to happy hour to eat, talk, and to have the occasional glass of wine.

In addition, Lucille has reconnected with her daughter Randi and her grandchildren. She went to New York to attend her granddaughter's bat mitzvah and her granddaughter has spent time visiting with her in Florida.

The Court does not attribute Lucille connecting with her daughters as their attempt to influence her. Instead, it is clear that Lucille is now free of Walter's control. The Court finds that Walter was the one who did not want to be with his daughters and Lucille just went along with it. As Roberta noted, if you did not need their father, he did not need you.

Testimony established that Lucille has had a strained relationship with Ronald dating back many years. This relationship has become increasingly strained due to the two incapacity petitions Ronald initiated against Lucille in May 2021 and March 2022. As noted, Ronald is currently adverse to Lucille in a federal lawsuit concerning the Walter and Lucille Rubin Foundation *(Rubin v. Rubin*, No. 9:21-CV-82014 (S.D. Fla.). Further, Ronald and Lucille are adverse parties in the proceedings to administer Walter's estate, *Lucille Rubin v. Ronald Rubin, et al.*, No. 502021CA001979XXXXMB AA, and separate litigation regarding Walter's trust. *Lucille Rubin v. Ronald Rubin*, *et al.*, No. 502021CP004302XXXXNB. If Ronald were appointed as Lucille's guardian, he would be able to control the litigation in which he is adverse to Lucille. The Court finds that this conflict and the history of Lucille's distrust of Ronald disqualifies Ronald from being appointed as guardian for his mother.

## CONCLUSION

At the conclusion of this case, the Court acknowledges that it is unusual for a parent to exclude a child from a will. Interestingly, the day before the instant guardianship proceeding was filed Lucille had changed her will to leave everything to her four children equally. However, upon learning that Ronald once again filed a petition to have her declared incapacitated, Lucille was

furious.  The Court makes it clear that the ruling on the issues of capacity and undue influence relate only to the lesser restrictive alternatives to guardianship and not as to the validity of any will or trust.

Upon consideration of the foregoing, it is:

**ORDERED AND ADJUDGED** as follows:

1. Lucille Rubin is hereby determined to be incapacitated and the scope of the guardianship needed is limited.

2. Consistent with § 744.331(6)(b), Fla. Stat. the Designation of Healthcare Surrogate and Durable Power of Attorney executed by Lucille Rubin on or about April 21, 2021 and May 4, 2021, respectively, are recognized by this Court as lesser restrictive alternatives and shall continue in full force and effect.

3. Ronald Rubin's Petition for Appointment of Guardian, Verified Motion to Suspend Authority Granted to Roberta Lehrman and Randi Barrett by Lucille Rubin's Durable Power of Attorney, and Petition to Revoke Declaration of Preneed Guardian are **DENIED**.

**DONE AND ORDERED** in chambers at Delray Beach, Palm Beach County, Florida this 22nd day of March, 2023, *nunc pro tunc* to February 19, 2023..

502022MH001380XXXXSB    03/22/2023
Charles E. Burton    Circuit Judge

502022MH001380XXXXSB    03/22/2023
Charles E. Burton
Circuit Judge

CHARLES E. BURTON
Circuit Court Judge

FINAL DISPOSITION FORM
(Fla.R.Civ.P. Form 1.998)
THE CLERK IS DIRECTED TO CLOSE THIS
FILE MEANS OF FINAL DISPOSITION
Disposed by Judge

Copies furnished:

Peter A. Sachs, Esq., Jones Foster P.A., 505 S. Flagler Drive, Suite 100, West Palm Beach, FL 33401, psachs@jonesfoster.com, msteen@jonesfoster.com

Mark F. Bideau, Esq., Greenberg Traurig, P.A., 777 S. Flagler Drive, Suite 300 East, West Palm Beach, FL  33401, bideaum@gtlaw.com

James S. Telepman, Esq., Cohen Norris Wolmer Ray Telepman Berkowitz & Cohen, 712 U.S. Hwy. One, Suite 400, North Palm Beach, FL  33408, jst@cohennorris.com,

Charles T. Weiss, Esq., 712 U.S. Highway One, Suite 301-2, North Palm Beach, FL 33408 ctw@weissestateplanning.com, pleadings@weissestateplanning.com

Jake Taylor, Esquire, 201 South Main Street, Suite 2200, Salt Lake City, Utah 84111, jst@clydesnow.com

# ADD 2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO: 9:21-CV-82014-MARRA

LUCILLE RUBIN, as sole officer and director,
and a member, of the Walter and Lucille Rubin
Foundation, Inc.,

Plaintiff,

v.

RONALD L. RUBIN, individually and as
purported member and director of the Walter
and Lucille Rubin Foundation, Inc., and
DARRELL (a/k/a DARYL) HORN,
individually and as purported director of the
Walter and Lucille Rubin Foundation, Inc.,

Defendants.

_____/

## OMNIBUS ORDER[1]

This cause is before the Court upon Roberta Lehrman and Randi Barrett's Motion to

Intervene, and, Upon Intervention, to Alter, Amend, and/or Vacate Order on Defendants' Motion

for Summary Judgment and Judgment and Reopen for Resolution on the Merits (DE 242);

Plaintiff's Motion to Alter, Amend and/or Vacate Order on Defendant's Motion for Summary

Judgment and Judgment (DE 243); Defendant Ronald L. Rubin's Motion for Joinder to

Defendants' Response to Plaintiff's Motion to Alter, Amend and/or Vacate Order (DE 247) and

Defendant Ronald L. Rubin's Motion to Join Defendants' Opposition to Motion to Intervene (DE

248).  The Court has carefully considered the Motions and is otherwise fully advised in the

premises.

---

[1] The Court presumes familiarity with its prior Orders.

I.    Background

As the parties are aware, this case concerns control of the Walter and Lucille Rubin Foundation, Inc. (the "Foundation") founded in 2007 by Plaintiff Lucille Rubin ("Lucille"), and her deceased husband, Walter Rubin.  Lucille previously sought a declaratory judgment, along with other relief, from this Court against her son, Defendant Ronald Rubin ("Ronald"), as a member and director of the Foundation, and Defendant Darrell Horn ("Horn"), as a director of the Foundation (collectively, "Defendants").  (Am. Compl., DE 79.)

On July 10, 2023, the Court entered Judgment in favor of Defendants (DE 240) on the ground that, after the filing of this lawsuit by Lucille, an intervening circumstance occurred; namely, Lucille became incompetent.  Once Lucille became incompetent, she could no longer be a member of the Foundation or pursue this lawsuit.  Since Lucille was the only plaintiff, her claims were moot, and the Court closed the case.

Roberta Lehrman and Randi Barrett, Lucille's daughters ("Intervenors"), have now filed a motion to intervene and, if granted, request that the Court alter, amend or vacate the summary judgment order, reopen the case for resolution on the merits, and allow them to replace Lucille as plaintiffs.  Intervenors state that they were appointed members of the Foundation on August 3, 2023, weeks after the Court's order granting Defendants' motion for summary judgment, and they wish to determine the proper control of the Foundation and pursue Lucille's claims against Defendants.

At the same time, Lucille has filed a motion to alter, amend and/or vacate the summary judgment order.  Lucille contends that, as a former shareholder, she has standing to purse claims for individual harm regardless of her present membership status in the Foundation. She also contends that the collateral consequence of Ronald's unchecked conduct has completely

2

transformed the Foundation and this consequence should defeat mootness. Lucille also points to newly discovered evidence, that Ronald is attempting to seize possession of artwork allegedly owned by Lucille, as a basis for the Court to reconsider its ruling. Lastly, Lucille claims that, if the Court lacked subject matter jurisdiction over the case, the Court did not have authority to enter judgment against Lucille.

Defendants oppose the motion to intervene on the following grounds: (1) the motion is untimely as it was filed nearly six months after Lucille was adjudicated incapacitated and filed after the instant lawsuit was dismissed; (2) intervention would result in severe prejudice to Defendants who would need to restart discovery and engage in motion practice; (3) the Intervenors should file a new lawsuit to protect their interests instead of intervening; (4) there is no lawsuit in which to intervene and (5) there is insufficient commonality between Lucille's and the Intervenors' claims.

With respect to Lucille's motion for reconsideration, Defendants respond that (1) there is no valid basis for reconsideration; (2) Lucille's arguments raise no new issues or should have been made previously; (3) the cases cited by Lucille regarding former shareholder status do not change the conclusion that Lucille's claims were moot and she lacked standing; (4) the collateral consequences exception does not apply; (5) there is no relevant new evidence and (6) there was no procedural error in issuing a final judgment.

In reply, the Intervenors state that the timeliness of an intervention motion depends on the circumstances of each case and intervention exists to supply interested nonparties an opportunity to protect their interests when a party to an action no longer can. The Intervenors state that they intend to pursue the same lawsuit as Lucille.

Lucille's reply to the motion for reconsideration contends that finality and the need to render just decisions favors granting the motion for reconsideration. Lucille states that the response fails to refute that Lucille has standing as a former member of the Foundation to pursue individual harm caused by Defendants' wrongful acts while she was a member.  Lucille argues that the collateral consequences doctrine applies to the facts here and the new evidence is properly before this Court. Finally, Lucille states that a judgment cannot be entered in the face of a dismissal on mootness grounds.

II.      Motion for Reconsideration

A.  Legal Standard

Courts have set forth three major grounds justifying reconsideration: "(1) an intervening change in controlling law; (2) the availability of new evidence and (3) the need to correct clear error or prevent manifest injustice." Williams v. Cruise Ships Catering and Serv. Int'l, N.V., 320 F. Supp. 2d 1347, 1357-58 (S.D. Fla. 2004).  Furthermore, in reviewing a motion to reconsider, the Court "will not alter a prior decision absent a showing of 'clear and obvious error' where 'the interests of justice' demand correction." Prudential Securities, Inc. v. Emerson, 919 F. Supp. 415, 417 (M.D. Fla. 1996) (quoting American Home Assurance, Co. v. Glenn Estess & Assoc. Inc., 763 F.2d 1237, 1239 n.2 (11th Cir. 1985)).

A motion for reconsideration should not be used to reiterate arguments already made or to ask the Court to "rethink what the Court ... already thought through." Z.K. Marine, Inc. v. M/V Archigetis, 808 F. Supp. 1561, 1563 (S.D. Fla. 1992) (quoting Above the Belt, Inc. v. Mel Bohannan Roofing, Inc., 99 F.R.D. 99, 101 (E.D. Va. 1983)). Nor should a motion for reconsideration be used to raise arguments that should have been made initially. See O'Neal v. Kennamer, 958 F.2d 1044, 1047 (11th Cir. 1992); Prudential, 919 F. Supp. at 417. Denial of a

4

motion for reconsideration is "especially soundly exercised when the party has failed to articulate any reason for the failure to raise an issue at an earlier stage in the litigation." Lussier v. Dugger, 904 F.2d 661, 667 (11th Cir. 1990). Finally, "reconsideration of a previous order is 'an extraordinary remedy, to be employed sparingly.'" Mannings v School Bd. of Hillsborough County, 149 F.R.D. 235 (M.D. Fla. 1993).

B. Discussion

The Court begins by noting Lucille's argument that she has standing to challenge individual harm as a former shareholder should have been made in her response to Defendants' summary judgment motion.  For that reason alone, it can be rejected as a basis for reconsideration.  Even if the Court was to consider this argument, however, it would reject it. First, in Lucille's twenty-five page, four count Amended Complaint, there is not a single claim for relief on behalf of Lucille individually. (DE 79.)  The "Introduction" on the first page of the Amended Complaint states "[t]his is an action to set aside the March 22, 2021 and April 7, 2021 Written Consents and the amendments adopted therein to the By-Laws of the Walter and Lucille Rubin Foundation, Inc."  Id. at 1.  Counts I and II ask for the relief described in the "introduction" and nothing more. Id. at 19-20.  Count III asks for injunctive relief against Defendants to prevent them from acting on behalf of the Foundation and to protect the assets of the Foundation from misappropriation. Id. at 23.  And Count IV asks the Court to declare that Lucille is a member of the Foundation and its sole officer, relief that is precluded by the express provisions of the By-Laws Lucille claims are operative and in full force and effect. Id. at 25; 2019 By-Laws, Ex. A-3, DE 218-4.  Furthermore, the express provisions of the By-Laws also state that "no rights, powers, [or] privileges .  .  . shall survive the  .  .  . incapacity .  .  . of a Member." 2019 By-Laws, Ex. A-3, DE 218-4.   Thus, the cases relied upon by Lucille, which

relate to former shareholders that may have suffered an injury for which they actually sought

relief, and whose rights were not expressly precluded by the operative corporate documents, are

not applicable here.

Nor is the Court persuaded by Lucille's reliance on the collateral consequences exception

to the mootness doctrine, an untimely argument that should have been raised in response to the

summary judgment motion.  See Brooks v. Georgia State Bd. of Elections, 59 F.3d 1114, 1121

(11th Cir. 1995).  This exception permits review of a moot case if the court's order will have

dangerous collateral consequences if not reversed.  Id.  Lucille claims that Ronald's conduct has

"transformed" the Foundation.  (DE 243 at 10.)

Significantly, Lucille has not pointed to any civil cases in this Circuit where this

exception has been applied.  Furthermore, the cases relied upon by Lucille do not support her

cause.  In Samsung Elecs. Co. v. Rambus, Inc., 398 F. Supp. 2d 470 (E.D. Va. 2005), upon

which Lucille relies, the court explained the doctrine:

> Even where an intervening event may moot a claim in terms of the court's
> inability to undo or grant effective relief as to past acts or conditions, if those past
> acts have present, future, or collateral consequences then judicial review may
> nevertheless remain available. The collateral consequences doctrine applies most
> often in criminal cases, where, for example, some of the consequences of a felony
> conviction (loss of voting privileges, probation, etc.) remain, despite the fact that
> the defendant has been released from jail. Such consequences are subsidiary to the
> primary harm of criminal convictions, prison time, and thus preserve jurisdiction
> over criminal appeals and petitions for writ of habeas corpus. A criminal case is
> moot only if it is shown that there is no possibility that any collateral legal
> consequences will be imposed on the basis of the challenged conviction.
>
> Outside of criminal appeals and habeas petitions, application of the collateral
> consequences exception to mootness is relatively rare. Indeed, the scope of the
> exception outside the criminal context is difficult to discern. Using the criminal
> cases as a model, however, it is apparent that the collateral consequences
> exception to mootness applies when a court's inability to provide relief on the
> merits of a claim may have adverse legal implications for a party simply by
> maintaining the status quo. The relevant status quo is that which has been

imposed by a judicial or administrative determination, which is then under review. A status quo imposed by the parties themselves and the collateral legal consequences therefrom do not invoke this narrow exception to mootness.

Id. at 477. (internal quotation marks, citations and brackets omitted).

The District of Virginia court then discusses the use of the collateral consequences doctrine in challenging specific actions of government agencies. Id.  The court, however, goes on to reject the use of this doctrine between two private entities in a civil context.[2] Id. at 478.  This Court concludes that there is no "dangerous" collateral consequence in this particular civil context.

The Court also concludes that Lucille's "new evidence" argument is equally without. Lucille claims that, after the summary judgment motion was granted, the "Foundation, at Ronald's direction, demanded that the curator appointed to administer Walter Rubin's estate seize possession of Walter and Lucille's vast collection of artwork." (DE 243 at 11.) Essentially, this argument sets forth the "collateral consequence" of Ronald having assumed control of the Foundation.  As stated previously, the Court is not persuaded that the collateral consequence to the mootness document applies on these facts. Furthermore, the documentation submitted relating to the newly asserted issue regarding "artwork" does not affect the Foundation.  The issue is whether the "artwork" is owned by Lucille or by her late husband Walter's estate, an issue that is properly before the state court dealing with Walter's estate. (DE 243 at 11; DE 245 at 7.)  That dispute cannot breathe new life into this litigation.

---

[2] Likewise, Magnuson v. Baker, 911 F.2d 330 (9th Cir. 1990), another case relied upon by Lucille, concerned a government agency.  The plaintiff was the estate of the deceased, whose passport application was rejected.  The Ninth Circuit, without specifically invoking the collateral consequences exception, decided that the case was not moot due the decedent's death because there were consequences to the estate that turned on the citizenship question. Id. at 332 n.4.

7

Finally, the Court will address Lucille's argument that because the Court determined that Lucille's action was moot, and therefore deprived the Court of subject matter jurisdiction, the Court lacked authority to enter a judgment in Defendants' favor.  To recap, the parties agreed to file summary judgment motions to address issues that arose from the state court's incapacity decision. (DE 208.)  In rendering its ruling on summary judgment, the Court did not rule on the merits of Plaintiff's claims. Instead, it dismissed on the case mootness grounds and entered a corresponding judgment. (DE 239, 240.)

Lucille contends that the judgment entered must be vacated because it was entered when the Court lacked subject matter jurisdiction.  (DE 243 at 12.)  In doing so, she relies upon Hedge Cap. Invs. Ltd. v. Sustainable Growth Grp. Holdings LLC, 593 F. App'x 937 (11th Cir. 2014). In that case, the Court vacated the district court's judgment and remanded the case to determine subject matter jurisdiction, and if established, resolve the case on the merits. Id. at 942.  The Court in Hedge Cap. noted that a dismissal for lack of subject matter jurisdiction is not a judgment on the merits and is entered without prejudice.  Id. (citing and quoting Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc., 524 F.3d 1229, 1232–33 (11th Cir. 2008); National Parks Conservation Ass'n v. Norton, 324 F.3d 1229, 1240 (11th Cir. 2003) ("if the court has no jurisdiction, it has no power to enter a judgment on the merits and must dismiss the action.") (brackets omitted).

Here, the Court did not reach the merits of the case and merely dismissed the case without prejudice due to the lack of subject matter jurisdiction.  The judgment was only entered to indicate that the summary judgment order was final and appealable.  The issuance of a

8

judgment after a determination of a lack of subject matter jurisdiction, however, is improper.[3]

See Hedge Cap., 593 F. App'x at 942 ("A district court has no power to enter judgment if it lacks subject matter jurisdiction."); Chapman v. First Index, Inc., 796 F.3d 783, 786 (7th Cir. 2015) ("[A] district court cannot enter judgment in a moot case. All it can do is dismiss for lack of a case or controversy."). For that reason, the Court vacates the judgment (DE 240) entered on July 10, 2023. This action does not alter the remaining portion of the Court's summary judgment order which dismissed the case as moot without prejudice. The Court considers this order and the summary judgment order as final and appealable.

III. Motion for Intervention

A. Legal Standard

Rule 24 of the Federal Rules of Civil Procedure provides, in pertinent part, as follows:

(a) Intervention of Right. On timely motion, the court must permit anyone to intervene who:
. . .

(2) claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest.

(b) Permissive Intervention.

(1) *In General*. On timely motion, the court may permit anyone to intervene who:
…

(B) has a claim or defense that shares with the main action a common question of law or fact ….

---

[3] Although Lucille contends it was improper for the Court to entertain a summary judgment motion as opposed to a motion for lack of subject matter jurisdiction, this was the approach the parties' requested from the Court. Significantly, the Court did not treat the summary judgment motion one which adjudicated the merits of the dispute. The cases relied upon by Lucille do not address this exact situation, i.e., where a court enters a judgment with a corresponding summary judgment order that did not address the merits. Nonetheless, the proper procedure would have been to entertain the summary judgment motion, as the parties requested, which the parties could then appeal as a final order.

9

(3) *Delay or Prejudice*. In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights.

Fed. R. Civ. P. 24

"To intervene of right under Rule 24(a)(2) [of the Federal Rules of Civil Procedure], a party must establish that (1) his application to intervene is timely; (2) he has an interest relating to the property or transaction which is the subject of the action; (3) he is so situated that disposition of the action, as a practical matter, may impede or impair his ability to protect that interest; and (4) his interest is represented inadequately by the existing parties to the suit." Fox v. Tyson Foods, Inc., 519 F.3d 1298, 1302-03 (11th Cir. 2008) (citation and internal quotation marks omitted); Fed. R. Civ. P. 24(a)(2). In considering whether a motion to intervene is timely, the Court must consider several factors:

> 1. The length of time during which the would-be intervenor actually knew or reasonably should have known of his interest in the case before he petitioned for leave to intervene; 2. The extent of the prejudice that the existing parties to the litigation may suffer as a result of the would-be intervenor's failure to apply for intervention as soon as he actually knew or reasonably should have known of his interest in the case; 3. The extent of the prejudice that the would-be intervenor may suffer if his petition for leave to intervene is denied; and 4. The existence of unusual circumstances militating either for or against a determination that the application is timely.

Salvors, Inc. v. Unidentified Wrecked & Abandoned Vessel, 861 F.3d 1278, 1294 (11th Cir. 2017) (internal brackets omitted). The burden is on the party seeking intervention. See Stone v. First Union Corp., 371 F.3d 1305, 1308 (11th Cir. 2004).

Permissive intervention is governed by Rule 24(b), which provides as follows: "On timely motion, the court may permit anyone to intervene who ... has a claim or defense that shares with the main action a common question of law or fact ... In exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of

the original parties' rights." Fed. R. Civ, P, 24(b)(1), (3). "If there is no right to intervene as of right under Rule 24(a), it is wholly discretionary with the court whether to allow intervention under Rule 24(b) and even though there is a common question of law or fact, or the requirements of Rule 24(b) are otherwise satisfied, the court may refuse to allow intervention." Worlds v. Dep't of Health & Rehab. Servs., State of Fla., 929 F.2d 591, 595 (11th Cir. 1991).

B.  Discussion

The Court beings its analysis of intervention by observing that "post-judgment motions to intervene are generally viewed with disfavor." Lanier Constr., Inc. v. Carbone Properties of Mobile, L.L.C., No. CV 06-00070-CB-B, 2008 WL 11425327, at *2 (S.D. Ala. Nov. 4, 2008) (citing Payne v. Block, 714 F.2d 1510, 1521 (11th Cir. 1983), vacated on other grounds, 469 U.S. 807 (1984)).[4]  This principle is particularly applicable here because the asserted basis which now gives rise to the intervention, the proposed Intervenors allegedly becoming members of the Foundation, did not occur until after the Court entered its ruling on summary judgment. [DE 242 at 5].  Hence, to the extent the proposed Intervenors are now claiming an interest in the Foundation which is the subject of the action, that interest was clearly manufactured after the fact in an attempt to create a basis to challenge the summary judgment ruling.

---

[4] While Intervenors cite to Commisioner, Alabama Dep't of Corr. v. Advance Loc. Media, LLC, 918 F.3d 1161 (11th Cir. 2019) for the statement that "[i]ntervention may be timely filed even if it occurs after a case has concluded; timeliness depends on the circumstances of each case," the Court concludes that the circumstances of that case are remarkably different.  There, the state of Alabama sought to limit access to its lethal exaction protocol and the press sought to intervene post-judgment to challenge the protective order which concerned that protocol.  Id. at 1163-64. Given that the case concerned the right of the press to access public records, the circumstances provided the Court with an additional basis to permit intervention.  No such significant constitutional right exists here. Likewise, the facts of Wilson v. Minor, 220 F.3d 1297 (11th Cir. 2000) and Cameron v. EMW Women's Surgical Ctr., P.S.C., 142 S. Ct. 1002 (2022), upon which proposed Intervenors rely, are similar. There, the intervenors sought to enforce their right to vote and defend the constitutionality of Kentucky's abortion law, respectively.  Even putting aside the differences between these constitutional cases and the instant case, under the circumstances of this case, there was simply no reason for the Intervenors to delay moving for intervention until after the summary judgment order was entered.

Furthermore, this manufactured after the fact interest which is the basis for the intervention comes too late. Lucille was deemed incapacitated almost six months before the Intervenors filed the instant motion and after the motions for summary judgment were briefed, argued and ruled upon by the Court.

Additionally, Defendants will suffer prejudice by the granting of the motion. By waiting post-judgment to intervene, discovery would have to be reopened and additional motion practice may be required. In contrast, the proposed Intervenors do not suffer significant prejudice by a denial of the request to intervene post-judgment. Since their claimed interest in the subject of litigation did not come about until after the case was decided, they cannot claim that they are so situated that disposition of the action would impede or impair an interest that did not exist while the litigation proceeded to disposition. To the extent the proposed Intervenors now have an interest to protect, which did not exist during the entire course of the litigation, they can protect it by filing their own lawsuit.[5]

 Lastly, the existence of unusual circumstances, namely, the proposed Intervenors' manufacturing an interest in the Foundation after the fact, militates against a determination that the application is timely. As the Court's summary judgment order set forth, there is no case or controversy in which to intervene. See Dillard v. Chilton Cnty. Comm'n, 495 F.3d 1324, 1330 (11th Cir. 2007) ("'piggyback" standing requires the existence of a justiciable case or controversy at the point at which intervention is sought."); Chiles v. Thornburgh, 865 F.2d 1197, 1213 (11th Cir. 1989) (to intervene under Rule 24, there must be a "justiciable case and controversy between the parties already in the lawsuit."). To the extent the proposed Intervenors

---

[5] The element for establishing a right to intervene, based on whether the interest of the intervenor will be represented adequately by the existing parties, does not apply here since the proposed Intervenors' interest was allegedly created after the case was decided. That element can only be applicable to an ongoing case.

claim that they are not piggybacking on Lucille's standing but have their own independent standing as members of the Foundation, they may file a new lawsuit and assert that standing. Indeed, they could have asserted that standing earlier had they not chosen to wait until this Court entered its summary judgment order to become members of the Foundation.

For the foregoing reasons, the Court concludes that the proposed Intervenors have not met the requirements for intervening as a matter of right. For the same reasons the Court also exercises its discretion to deny permissive intervention.[6]

IV. Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1)       Robert Lehrman and Randi Barrett's Motion to Intervene, and, Upon Intervention, to Alter, Amend, and/or Vacate Order on Defendants' Motion for Summary Judgment and Judgment and Reopen for Resolution on the Merits (DE 242) is **DENIED**.

2)        Plaintiff's Motion to Alter, Amend and/or Vacate Order on Defendant's Motion for Summary Judgment and Judgment (DE 243) is **DENIED IN PART AND GRANTED IN PART.** The summary judgment order (DE 239) is amended only to the extent that it allowed for the entry of judgment. The Judgment (DE 240) is **VACATED**.

3)       Defendant Ronald L. Rubin's Motion for Joinder to Defendants' Response to Plaintiff's Motion to Alter, Amend and/or Vacate Order (DE 247) is **GRANTED**.

---

[6] When considering timeliness in terms of permissive intervention, the Court must look to prevent prejudice of the original parties' rights. Fed. R. Civ. P. 24(b). As discussed supra, Defendants would be prejudiced if the motion to intervention is granted at this late date.

13

4)      Defendant Ronald L. Rubin's Motion to Join Defendants' Opposition to Motion

to Intervene (DE 248) is **GRANTED**.

      **DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County,

Florida, this 18th day of October, 2023.

KENNETH A. MARRA
United States District Judge

14

# ADD 3

IN THE CIRCUIT COURT OF THE FIFTEENTH JUDICIAL
CIRCUIT IN AND FOR PALM BEACH COUNTY, FLORIDA

IN RE: ESTATE OF                  CASE NO. 2021CP001979XXXXNB

WALTER RUBIN,               PROBATE DIVISION IZ

      Deceased.

_____/

LUCILLE RUBIN,

      Plaintiff                CAEE NO. 2021CP004302XXXXNB

v.

RONALD L. RUBIN, individually
And as Trustee of the Second Amended and
Restated Walter H. Rubin Declaration of
Trust, as Amended, et. al.

      Defendants.

_____/

## FINAL JUDGMENT AND ORDER ON COMPETING PETITIONS
## <u>FOR ADMINISTRATION</u>

This case came before the Court for a trial on Ronald L. Rubin's Second Amended Petition for Administration of The Estate of Walter H. Rubin filed on May 4, 2021 and the Amended Complaint of Lucille Rubin filed on August 31, 2021. The Amended Complaint seeks the following relief: Count I- Declaration as to Invalidity of the April 7, 2021 Amendment based upon Undue Influence, Count II- Declaration as to Invalidity of the April 7, 2021 Amendment based upon Lack of Capacity, Count III- Declaration as to Invalidity of the March 22, 2021 Amendment based upon Undue Influence, Count IV- Declaration as to Invalidity of the March 22, 2021 Amendment based upon Lack of Capacity, Count V-Tortious Interference With Expectancy and/or

Inheritance, Count VI-Removal of Ronald L. Rubin as Trustee of the Amendments and the Sub-Trusts.  Answer and Affirmative Defenses were filed to the amended complaint by Walter and Lucille Rubin Foundation, Inc., Ronald L. Rubin and Richard A. Rubin.

Lucille was judicially determined to be incapacitated and Roberta Lehrman (Roberta) and Randi Barrett (Randi) were confirmed as her agents via a durable power of attorney as lesser restrictive alternatives to guardianship pursuant to this Court's Order entered February 19, 2023 in the matter styled as *In Re: Guardianship of: Lucille Rubin*, Case No. 2022GA000337XXXXSB (the "Guardianship Order"). Pursuant to this Court's Agreed Order on Substitution Motion as to Lucille Rubin entered August 7, 2023, Roberta and Randi were substituted in place of Lucille in this consolidated action as her agents and attorneys-in-fact.

The case proceeded to trial on October 30, 2023 – November 2, 2023, November 6 and 7, 2023, November 15-17, 2023, November 27, 2023 – November 29, 2023.  Peter Forman, Esquire, Jonathan Galler, Esquire, Norman Fleischer, Esquire and Eric Rice, Esquire represent Lucille Rubin by and through her attorneys-in-fact, Roberta and Randi , Charles Rubin (Chuck), Esquire and Lawrence Miller, Esquire.

Jake Taylor, Esquire represents Ronald Rubin (Ronald).  Brian Koch, Esquire and Joshua Levenson, Esquire represent The Walter and Lucille Rubin Foundation, Inc.  R. Lee McElroy IV, Esquire represents Steven Tubbs, Christopher Marquardt, Esquire represents Darrell Horn, Mark Bideau, Esquire represents Roberta and Randi.  Richard A. Rubin is *pro se.*

This case has been vigorously litigated by all parties.  The Court was impressed at the professionalism exhibited by all counsel in this matter.  In making findings of facts and conclusions of law in this case, the Court has carefully considered, compared, and weighed all of the evidence, including the exhibits accepted into evidence. The Court has observed the candor and demeanor

of the witnesses and determined their credibility. The Court has resolved all of the conflicts in the evidence. In summarizing the substance of the witnesses' testimony, the Court has not included every detail of their testimony, nor attempted to state non-essential facts; however, because the Court has not done so does not mean that the Court did not consider such details and facts.

## FACTUAL BACKGROUND

Walter and Lucille Rubin were married for more than 60 years having married in 1958. Although Walter and Lucille had accumulated substantial wealth, 80 to 100 million dollars, their estate plan primarily provided that their assets would pass through a marital trust for the surviving spouse and upon the last to die, would pass to their charitable foundation.

Walter and Lucille met with an estate attorney, William Boyes, Esquire, in late 2005. Their existing will dated May 26, 1994 gave $100,000 to each child. On December 23, 2005, Boyes prepared the First Codicil that removed all of the children as beneficiaries. Walter informed Boyes that he didn't want any of his children to serve in a fiduciary capacity. According to Boyes, Walter indicated to him that he did not have any close friends who could serve as a fiduciary so he designated Boyes and his CPA, Steven Tubbs as his fiduciaries. At that time Walter and Lucille did not have much of a relationship with any of their children.

On January 3, 2008, Boyes prepared a Declaration of Trust, will, and durable power of attorney (DPOA). The designated fiduciary was Lucille Rubin and if unable to serve, Boyes and Tubbs would serve. On the DPOA, they named each other and none of their children. In 2017, Walter decided to hire a new lawyer and never even called Boyes to tell him even though he had been his lawyer for the past 12 years. Instead, Charles Rubin from the Gutter, Chaves law firm contacted Boyes requesting Walter and Lucille's file as he had been retained to represent them. According to Boyes, no reason was given for his termination and he did not call Walter to ask.

Steven Tubbs (Tubbs) met Walter and Lucille in 2003.  He described Walter as having a strong personality but that he did not like conflicts.  The Rubin's were moving to Delray Beach in 2017 and they asked Tubbs if he could refer them to a lawyer in Boca Raton.  Tubbs referred them to Lawrence Miller from the Gutter, Chaves firm.

Tubbs remained with Walter and Lucille until he was terminated in March, 2021, on the same day as Charles Rubin, Larry Miller and Greg Coleman.  Coleman represented Walter on a Tallahassee lawsuit involving Ronald's termination from the DeSantis administration.  According to Tubbs, he would have four or five meetings with Walter each year as well as talking on the telephone at least once per month.  Tubbs would also have contact with Walter's bookkeeper, Elizabeth Wertman (Liz).

In 2020-2021, Ronald Rubin was involved in a lawsuit in Tallahassee after he was terminated from his employment with the State of Florida as Commissioner of Finance.  Ronald was continuously asking his father for money to fund his lawsuit and at one point asked his father for $500,000.  While there was testimony regarding loans, no written loan documents were ever executed.  On March 5, 2021 Chuck sent Ronald a document that would make Walter's funding of Ronald's Tallahassee litigation a loan rather than a gift. Ronald refused to sign the document, and did not respond to Chuck's email. Ronald asked Walter about the proposed loan, and Walter replied that he had no idea why Tubbs and Chuck would say that his payment of Ronald's legal expenses was a loan.

On March 9, 2021, Walter called Tubbs to ask why he and Chuck had told Ronald to sign a loan document. Tubbs replied, "Don't you remember Walter – we discussed this several times?" Walter emphatically responded: "Absolutely not!" After further discussion, Walter directed Tubbs to pay the Bailey Glasser law firm $500,000 to represent Ronald and complete the

Tallahassee litigation. Ronald had a lengthy discussion with Walter about his termination and after Walter agreed to pay the fees and told Tubbs to pay Ronald's lawyer the $500,000 requested.

Ronald was spending more time with his parents and according to Tubbs, he told Walter that he thought that Liz was stealing from him. Ronald denied this but had only suggested that his father should audit his finances occasionally to make sure that no one was stealing. Walter then called Tubbs who completed an audit and found no money missing. The only thing he could not account for were purchases on Walter's Amazon account because he could not determine whom the purchases were for. Walter was not concerned at that point.

As far as the four Rubin children were concerned, the evidence showed that Randi has not had much of a relationship with her parents for many years. She testified that she married a man who was not of the Jewish faith and her parents did not attend her wedding. Walter and Lucille considered their son Richard to be an unsuccessful writer who was living in Maine. According to Walter, he wrote books that nobody wanted to read. Roberta has had an on again off again relationship with her parents. She was the only one living near her parents. According to Roberta, her father had issues apparently due to her inability to get over the death of her only child. Ronald was an attorney whom Walter and Lucille described as very smart, but a problem child. According to Walter, he was a "bulldozer".

Roberta and Randi described their father as very controlling and that everything had to be about him. For example, Walter would be upset because Roberta and Randi remained very close over the years but that did not involve him. Walter seemed to want everyone to need him. Richard called his parents frequently and spoke to his father on the telephone when Walter wanted to take the call. The evidence showed that Ronald had the closest relationship with

Walter and Lucille in the few years prior to Walter's death, calling his parents daily and assisting in their medical care and administrative matters.  Ronald, who lives in Washington, DC, visited and cared for his parents every day between March 3, 2021 and Walter's passing on April 11, 2021. Richard visited them only once in the last two years of Walter's life.  Roberta, who lives in Delray Beach, rarely saw her parents and had no involvement in their medical care from 2018 until Walter's death.  Randi testified that she had seen her parents for a total of approximately five hours in the four years before Walter passed away.

Chuck Rubin first met with Walter and Lucille in 2017 after they had left their prior attorney, William Boyes.  Chuck Rubin testified that he is a board certified estate planning attorney and that he had been Walter and Lucille's estate lawyer since 2017.  He testified that Walter was very sharp when it came to his assets.  He testified that he had prepared several estate documents for Walter and Lucille.  Eventually, the Rubin's provided Trusts for Ronald, Richard and Roberta but continued to exclude Randi from their estate plan.  Chuck Rubin estimated that Walter and Lucille's estate was worth approximately $40 million at the time, a number which eventually doubled to between $80-100 million.

In 2017, Walter established a six million dollar Trust for Roberta and excluded the other three children.  In 2018, he created a Trust for all of the children for $2.5 million, except Randi.  In 2019, he changed the amounts to five million for Roberta and $5.1 million for Ronald and Richard.  Walter flipped flopped often and one minute Roberta was in and in the next minute she was out.  Often, Walter would have meetings with Chuck Rubin to discuss changes to his documents but ultimately he would never get around to doing it.  In the Chuck Rubin estate documents, Chuck Rubin and Larry Miller were listed as personal representatives and fiduciaries and would serve after Lucille and served on the board of the charitable foundation.  Although the

documents allowed Rubin and Miller to both collect fiduciary fees, Rubin explained that in a meeting with that there would only be one fee.  He wrote some notes on a piece of paper and gave Walter a copy.

The Chuck Rubin fee issue would come up frequently in this case.  In addition, the fact that Chuck Rubin rarely took telephone calls from Walter and would return the call later.  Chuck told all of his clients that he would not take calls if he was with another client but would always return the calls later.  Chuck Rubin noted that he was terminated from representing Walter and Lucille and that the stated reason was the amount of fees charged.  Chuck Rubin also maintained very detailed notes of his conversations with Walter.

He testified that he had first met Ronald Rubin during a conference with Walter wherein Ronald was questioning the need for a trust and suggesting to his father that he leave the money outright.  Chuck Rubin testified that he was concerned about Walter and noted that Ronald had told him the he was on medication.  He also testified that Walter would often mention Lucille's short-term memory issues during their conversations.  Finally he testified that Ronald's conduct was concerning to him and he felt that there was some red flags regarding possible undue influence.

On July 10, 2019, Walter, Liz, and Ronald met with Chuck Rubin.  When Liz and Ronald were out of the room, Walter told Chuck that Ronald had seen the 2008 estate documents.  According to Chuck, Walter told him that on January 16, 2020, he had asked Ronald to come to Florida to help take care of Lucille who had dementia.   Chuck Rubin was concerned about some potential red flags because Walter was discussing adding Ronald and Liz as members of the Foundation.  During one meeting with Walter and Ronald, Walter expressed concern about the fiduciary fees charged by Chuck Rubin and Lawrence Miller.

Over the next two years, Walter often to discussed adding Ronald as a fiduciary in his Will and Trust, and as a member of the Foundation. Liz testified that Ronald and Walter had a good relationship in the spring of 2020, and that Walter expressly told Liz he was considering adding Ronald and Liz as fiduciaries in their estate documents, and as members of the Foundation. The March and April 2020 emails between Chuck, Walter, and Liz confirm Liz's testimony.

Chuck Rubin also referred Greg Coleman to represent Walter in the Tallahassee litigation involving Ronald. According to Tubbs, Walter wanted Tubbs to deal with Greg Coleman and a DPOA was prepared. Apparently, the DPOA was not limited to Tubbs just dealing with the Tallahassee litigation but gave him authority over everything. Ultimately, Coleman's services were terminated the same day as Tubbs and Chuck Rubin. Candidly, a great deal of time was spent refuting Walter's claim that Gutter Chaves was billing too much. Ronald testified that he encouraged his father to hold off firing Tubbs until after the federal tax filing deadline.

The Court has observed that Walter Rubin did not appear to be very loyal to any of the professionals who worked for him. That included William Boyes, Steve Tubbs, Chuck Rubin, Greg Coleman, and Liz Wertman. Walter believed whatever he wanted to believe about these people and the truth was irrelevant.

Having resolved his attorney fee issues, Ronald came to Florida in early March, 2021. He spent every day with his parents making doctor appointments and getting anything his parents needed. He helped Walter with his business and would sit with Lucille and do jigsaw puzzles with her. Walter appeared to be happy Ronald was there. He included him on telephone calls with his investment advisor, Darrell Horn. Walter had entered the hospital on March 12, 2021 after he had fallen the night before. He would not let Lucille call anyone to help him up so he spent the night on the floor.

Page 8 of 29

Prior to hiring a lawyer, Walter spoke to Darrell Horn about having his documents reviewed. Horn sent the documents to a lawyer named Sontag.  Walter was very happy with Horn because he had invested his money and had done very well.  Horn spoke with Walter while Walter was in the hospital, and Horn relayed to Walter attorney Sontag's comments that it was unusual for an accountant to obtain a broad power of attorney for a client, and for the attorney who drafted estate documents to insert himself as a fiduciary in those documents.  Horn believed that Walter was going to retain Sontag to draft new estate documents. Horn had also referred Walter to a CPA whom he hired. Horn planned to visit Walter on March 16, 2021, but the trip was delayed. Shortly thereafter, Horn received a telephone call from Mora during which Mora informed him that Walter had retained Mora to update the Rubins' estate documents.

Abe Mora is a lawyer who is board certified in the area of estate planning.  He testified that he was contacted by Ronald Rubin on March 15, 2021, while Walter Rubin was in the hospital. Ronald explained that a friend of his had referred Abe Mora and his father wanted to interview him regarding possibly representing him.  Abe asked that he be sent any documents in advance so that he could be prepared for the meeting.  During the first meeting at the hospital on March 16, 2021, they primarily just talked and Walter indicated that he would think about hiring him. Abe Mora spent 2.5 hours with Walter at the hospital.  Ronald Rubin was not present for that meeting.  The next meeting occurred on March 18, 2021 at the hospital.  Once again Ronald was not in the room.   Mora and Walter further discussed the changes Walter wanted to make to his estate documents. Ultimately, Abe Mora was hired and he prepared will and trust documents for Walter and Lucille.  Mora described Walter as sitting up in bed with his eyes open and he appeared to be neat and not disheveled.

Mora met with Walter again on March 20, March 22, and April 7, 2021, totaling over 10 hours of in-person meetings with Walter, during which they discussed changes to Walter's estate documents, and executed those changes. Mora testified that Ronald was never in the room when Mora explained the changes to Walter, nor was Ronald present when Walter signed any of his documents.

The documents were executed on March 22, 2021 and April 7, 2021. Walter had made a substantial change in his estate plan. Walter increased the trusts for three of his children (Randi was still excluded), designated Ronald as Walter and Lucille's preneed guardian, durable power of attorney (DPOA), and health care surrogate and put Ronald on the charitable foundation board. In addition, the beneficiaries, Ronald, Richard, and Roberta, were to receive the trust benefit upon the first of Walter or Lucille to die. Finally, Ronald, as Trustee, could invade the principal of the Trust under certain conditions, which had never been allowed before.

Each time Abe Mora met with Walter he described him as fully able to understand the documents and was fully aware of what he was signing. In addition, Ronald Rubin was never in the room when he met with Walter and Lucille. In his opinion, Walter had testamentary capacity. Abe Mora testified that he and Walter discussed how much of the tax exemption was available from him and Lucille, and they discussed the issue of the children's trusts. They discussed why he was waiting for the second of himself and Lucille to die as opposed to the first since his children were already older. According to Abe, Walter was not concerned with the tax issues because Lucille had plenty of money to live on from the marital trust and had at least $15 million dollars in her own name.

Mora testified that the Chuck Rubin's testimony that Lucille had lost "over 40 million dollars" due to the 2021 changes was disingenuous. While the corpus of Lucille's Trust would have $40

million less at its inception, Lucille would not have received that money outright – she only would have received the income from the $40 million, and the remainder of her trust would still go to the Foundation. Mora testified that the net impact on Lucille of moving the funding of the children's trusts up to the death of the first spouse would ultimately be negligible because Lucille had more money than she could ever possibly need under either the 2019 estate documents or the 2021 Testamentary Documents. Mora testified that he openly discussed these issues with Walter and Lucille, and that Lucille approved of the changes Walter wanted to make. Also, Lucille signed estate documents that were reciprocal to those signed by Walter. Whether Mora's opinion was correct or whether Chuck Rubin's opinion was correct is not important to this Court's decision. Rather, what is important is what Walter and Lucille believed about the things he heard from Mora and Horn.

Mora testified that Walter wanted Ronald to be his fiduciary and a member of the Foundation, in part due to Walter's improved relationship with Ronald, and also because Ronald understood Walter's businesses (Ronald has an MBA and is a lawyer). Mora testified that Walter said he had a close relationship with Ronald, that he was proud of Ronald, and that Ronald was a logical choice to oversee the Foundation and Walter's estate and trust. Walter told Mora that choosing Ronald would ensure that the charities that were to receive money from the Foundation would be causes that Walter believed in rather than causes his attorneys believed in.

Mora testified that he kept all of the documents executed by Walter and Lucille in his possession until Walter passed away. Prior to Walter's passing, he never discussed the documents with Ronald, or any of the changes that Walter and Lucille had made. The first time Mora showed Ronald the 2021 Testamentary Documents was on April 12, 2021, the day after Walter died. Notably, Lucille signed the same documents as Walter. Moreover, Lucille signed

lesser restrictive documents in the guardianship case on April 21, 2021 and May 4, 2021. Roberta and Randi argued that Lucille had the capacity to sign and this Court agreed.

Horn testified that he was not surprised that Walter had appointed Ronald a fiduciary under the 2021 Testamentary Documents because (1) Walter had discussed including Ronald in his financial affairs multiple times in the prior two years; (2) Walter had told Horn that he was proud of Ronald, trusted Ronald, and wanted him involved in his business; and (3) it was normal for a child with a close relationship with his parents to be named as their personal representative. Ronald's appointment was also consistent with the preference for a family member that Sontag had expressed in his memorandum to Horn.

Horn further testified based on his discussions with Walter and Lucille regarding their financial needs, he understood that Lucille would need approximately $400,000 to $500,000 per year for her care, and to maintain her lifestyle. He suggested to Walter privately that the treatment of his children was harsh under his then existing documents (the 2019 Trust), and since the size of his estate had doubled in the past five years, he might consider increasing the gifts to his children.

### HISTORY OF WALTER AND LUCILLE RUBIN'S ESTATE PLANS

In the Joint Pretrial Stipulation, the parties stipulated to the following facts with respect to the history of Walter's testamentary documents:

> A. On **January 3, 2008**, Walter executed a Will prepared by William Boyes (the "2008 Will"). Under the 2008 Will, Lucille was named personal representative; William Boyes ("Boyes") was named alternate personal representative if Lucille was unwilling or unable to act personal

representative; and Tubbs was named second alternate personal representative if Boyes was unwilling or unable to act as personal representative.

B. On **January 3, 2008**, Walter executed a Declaration of Trust prepared by Boyes (the "2008 Trust"). Under the 2008 Trust, Walter was Trustee during his lifetime; Lucille and Boyes were named as successor co-trustees; Tubbs was named as alternate successor co-trustee. Under the 2008 Trust, upon Walter's death, all assets would pass to Lucille via a family trust, with the remainder going to specified charities upon Lucille's death.

C. On **June 15, 2017**, Walter executed the First Codicil to the Will of Walter H. Rubin that had been prepared by Chuck. This codicil removed Boyes as the successor personal representative, and added both Chuck and Larry as successor personal representatives to Lucille, and named Tubbs alternate personal representative if neither Chuck nor Larry could serve as personal representative.

D. On **June 15, 2017**, Walter executed a First Amendment to the 2008 Trust that, among other things, removed Boyes as a successor co-trustee, and made both Chuck and Larry (together) (a) successor trustees if Walter resigned as trustee, and Lucille was unwilling or unable to serve as trustee during Walter's lifetime; and (b) successor trustees with Lucille upon Walter's death.

E. On **September 7, 2018**, Walter executed a Will that had been prepared by Chuck (the "2018 Will"). Under the 2018 Will, Lucille, Chuck, and Larry (all three, together) were named personal representatives, with Tubbs to serve as

personal representative in the event that none of the three (Lucille, Chuck, and Larry) could serve as personal representative.

F.  On **September 7, 2018**, Walter executed an Amended and Restated Trust (the "2018 Trust") that had been prepared by Chuck. Under the 2018 Trust, upon Walter's death, Lucille, Chuck, and Larry (all three, together) were named successor trustees, with Tubbs to serve as successor trustee if none of the three trustees (Lucille, Chuck, and Larry) were serving as trustee. The 2018 Trust created a marital trust for Lucille, and $2.5 million subtrusts for Roberta, Ronald, and Richard that would pay each child $50,000 a year, inflation-adjusted, after taxes. If Walter died before Lucille, the children's subtrusts would funded (and would begin annual distributions) after Lucille's death. The remainder beneficiary of the 2018 Trust, and all trusts thereunder, was the Foundation.

G.  On **September 7, 2018**, Walter and Lucille executed a Written Consent To and Record of Action by Members and Directors of the Foundation that amended the By-Laws of the Foundation (the "2018 Bylaws"). The 2018 Bylaws, which had been prepared by Chuck, would have made both Chuck and Larry members of the Foundation (in addition to Lucille, if she was still a member) upon Walter's death or incapacity.

H.  On **August 29, 2019**, Walter executed a Second Amended and Restated Trust (the "2019 Trust"), which had been prepared by Chuck. The 2019 Trust increased the trusts for Roberta, Ronald, and Richard to $5 million, with $75,000 annual payments, and added $100,000 disbursements to Ronald and

Richard, but not to Roberta, upon Walter's death. The 2019 Trust did not change the 2018 Trust's trustee provisions.

I.  On **August 29, 2019**, Walter and Lucille executed a Written Consent To and Record of Action by Members and Directors of the Foundation that amended the By-Laws of the Foundation (the "2019 Bylaws"). The 2019 Bylaws, which had been prepared by Chuck, did not change the 2018 Bylaws' provisions regarding Chuck's and Larry's appointment as members upon Walter's death or incapacity, and added provisions that would prevent any of Walter and Lucille's children (Roberta, Ronald, Richard and Randi) from becoming a member, director, or officer of the Foundation.

J.  On **March 22, 2021**, Walter executed a Will that had been prepared by Abraham Mora (the "2021 Will"). The 2021 Will was executed with the formalities required by law. Under the 2021 Will, Ronald was the named personal representative.

K.  On **March 22, 2021**, Walter executed an amendment to the 2019 Trust that had been prepared by Abraham Mora (the "March 2021 Trust Amendment"). The March 2021 Trust Amendment was executed with the formalities required by law. Under the March 2022 Trust Amendment, Ronald was named as Trustee, and Horn was named as Trust Protector.

L.  On **March 22, 2021**, Walter and Lucille executed a Written Consent To and Record of Action by Members and Directors of the Foundation that amended the By-Laws of the Foundation (the "March 2021 Bylaws"). The March 2021 Bylaws, which had been prepared by Abraham Mora ("Mora"), were executed

with the formalities required by law. The March 2021 Bylaws removed the provisions added to the 2019 Bylaws that would have prevented the Rubins' children from serving as members, directors, or officers of the Foundation. Under the March 2021 Bylaws, upon Walter's death or incapacity, Ronald (rather than Chuck and Larry) would be appointed a member of the Foundation, and Ronald and Horn would be appointed directors of the Foundation.

M. On **April 7, 2021**, Walter executed an amendment to the March 2021 Trust Amendment that had been prepared by Mora (the "April 2021 Trust Amendment"). The April 2021 Trust Amendment was executed with the formalities required by law, and did not change the March 2021 Trust Amendment's trustee provisions.

N. On **April 7, 2021**, Walter and Lucille executed a Written Consent To and Record of Action by Members and Directors of the Foundation that amended the By-Laws of the Foundation (the "April 2021 Bylaws"). The April 2021 Bylaws, which had been prepared by Mora, were executed with the formalities required by law, and did not change the member, director, or officer provisions of the March 2021 Bylaws.

This Court previously found the changes made in the documents prepared by Mora to be substantial changes in the guardianship case involving Lucille. However, this Court has heard a great deal more testimony and has seen much more evidence in this case than the guardianship case. Certainly, the trust amounts provided for the children doubled and the Mora trusts authorize the trustee to access the principal. The Petitioners contend that Ronald engaged in

multiple attempts to unduly influence Walter and his estate plan because he desired total control of Walter's affairs for his own purpose, status, and financial gain. While Ronald may very well share some of his father's personality traits and would in all likelihood enjoy the status and financial gain, the Court does not find it unusual that Walter would prefer to have his son involved in the family affairs and the foundation as opposed to lawyers and an accountant that he did not have a personal relationship.

The evidence showed that Walter and Lucille had complained about Chuck's fees for a couple of years. Moreover, Chuck had not seen Walter and Lucille in person since before the COVID lockdown. Walter and Lucille dropped their attorney Boyce who had represented them for 12 years simply because they moved from Palm Beach Gardens to Delray Beach without even a telephone call. It is not that unusual for them to drop Chuck Rubin when they moved back to Palm Beach Gardens after he represented them for only four years. In addition, the evidence was not disputed that Walter began having a closer relationship with Ronald for the two years prior to his death and had repeatedly asked Ronald to move from Washington, D.C. to Florida to help take care of he and Lucille.

**WALTER RUBIN'S MEDICAL ISSUES**

Dr. Neal Rothschild was Walter's oncologist and was treating him for lung cancer. In November, 2020 he prescribed a drug called Retevmo. Apparently the drug caused Walter to become confused and during the next several months Walter would stop using the drug and his mental state was much better. He would then be put on a lower dose and his confusion would return and he stopped taking the drug altogether in early March 2021. Dr. Rothschild had telemedicine visits with Walter on March 24, 2021 and March 31, 2021. He testified that Walter had full capacity to discuss DNR and medical care issues in late March 202. Dr. Rothschild

testified that Walter did not have trouble understanding him and that he was not demonstrably impaired at any time.  Finally, he noted that if Walter got a good night sleep he would perform better the next day.

Dr. Robert Wacks testified that he has practiced internal medicine in West Palm Beach for over forty years.  Lucille and Walter were patients of his and he testified that Ronald was involved in his father's health care since day one.  Lucille continued to see him for a short time after Walter's death.  Dr. Wacks made a home visit to see Walter on April 6, 2021.  He described him as confused, sleepy and barely responsive.  He opined that Walter was thin and frail and believed he was in the process of dying and that there was really no treatment.  Dr, Wacks testified that "no one controlled Walter".  He never believed him to be incapacitated other than on April 6th because he was too sick to be competent.  He gave Walter a high dose of Prednisone on that date.

Dorothy Mullings is a registered nurse and is employed with Horizon.  She took care of Walter every day for approximately three weeks from March 20, 2021 through April 11, 2021.  Dorothy also explained her nurse notes and explained how various observations on the notes were just carried over and over on the notes kept by the agency.  Dorothy worked a shift from 8:00 a.m. to 8:00 p.m.  She testified that Walter was primarily alert, had good days and bad days.  She indicated that if he had a good night he was generally better the next day.  She said that Walter talked to her often about his children and one day told her he wanted to change his papers.  He also said that he wanted to change his lawyer.  Dorothy testified that Walter told her his lawyer was coming back to their apartment because he wanted to sign documents that doubled the funding to the Children's Trusts and provided $100,000 to Jason Barrett (Randi's son) – the only grandchild with whom Walter had a relationship.  When Walter used to talk

about changing his lawyer, Lucille stated "the crooked one", referring to Chuck Rubin. Dorothy also noted that Walter was strong willed.

On the morning of April 7, 2021, Walter Rubin executed the April 2021 Trust Amendment in front of Mora, Lynn Douglas (Mora's paralegal), and Sandra Alvarez (Lucille's nurse). Dorothy's notes state that Walter was "awake and alert," had "a good night" and was "asking for documents.

The Court also heard from Rebecca Stavrakas, another nurse who took care of Walter in March 2021. She described Walter as strong minded and strong willed. She described some conversations that she had with Walter about his children. She testified that Walter told her that he felt bad that Ronald was the only child who was there for him but he felt good and was comfortable knowing that Ronald would take care of Lucille. She described Lucille as very forgetful and very confused at that time.

Ronald Rubin testified that he came to Florida in early March, 2021. After spending the first night or two at Roberta's home, he stayed at an apartment at Devonshire. He spent almost every day with his parents doing jigsaw puzzles with his mother or talking with his father. Walter spent most of his time in a bed, first at the hospital and then at home. Ronald testified that he initially came to Palm Beach Gardens from his home in Washington, D.C. to visit with his father for his birthday in early March 2021. Ronald understood his father was preparing to go to the hospital for routine tests, but the tests were followed by swallowing problems, pneumonia, and later his death. Ronald testified to his constant presence with his father at the hospital, staying with his father alone for substantial periods of time each day and sometimes staying overnight. According to Ronald, Walter wanted him to find a couple of lawyers that he could interview because he wanted to get rid of Charles Rubin because his fees were too high. He found Abe Mora through an old

friend and Abe Mora wound up meeting Walter when he was in the hospital. Ronald stated that he never influenced his father to change his estate documents and that the decision to fire Charles Rubin and hire Abe Mora was made solely by his father.

Roberta Lehrman testified that she lives in Delray Beach, Florida. She indicated that she did not have a very close relationship with her parents especially after the death of her 24 year-old son. Her father was the type of man that if you did not need him, he did not need you. He felt that Roberta needed to get on with her life and she was not ready to do that. She described her mother as typical for their generation. Her father made all of the financial decisions and her mother went along with it. She noted that she has been very close with her sister Randi, who has had very little to do with her parents. She added that Randi and her husband are very successful and she did not need her father's control.

Roberta testified that Ronald stayed with her for a night or two when he came to Florida in March 2021. After he moved to a hotel or apartment at Devonshire, he was with their parents every day. Roberta assumed that he was helping Lucille and Walter and she was happy about that. After the family returned from New York for Walter's funeral, things started to fall apart. First, Ronald sent her a picture of Lucille's charm bracelet that he found. This was the one he had accused Lucille's caretaker of stealing. When Roberta told Ronald to give it to Lucille and that she will be so happy, he responded that he had all the jewelry and he was safe keeping it. Lucille then asked Ronald about the papers she had signed with Abe Mora and wanted to know about Walter's estate at which point Ronald responded something to the effect that it was like a baby and needed time to grow.

## TESTAMENTARY CAPACITY AND UNDUE INFLUENCE

"It has long been emphasized that the right to dispose of one's property is highly valuable, and it is the policy of the law to hold a last will and testament good wherever possible." *Raimi v. Furlong*, 702 So. 2d 1273, 1286 (Fla. 3d DCA 1997). A person who is old, physically frail, sick, suffering from failing memory or wavering judgment does not necessarily lack testamentary capacity. *See In re Dunson's Estate*, 141 So. 2d 601, 604 (Fla. 2d DCA 1962). Instead, any person who is of sound mind and who is either eighteen (18) or more years of age or an emancipated minor may make a will. Testamentary capacity is a relatively low standard, and the burden to overthrow a will "on the ground of lack of testamentary capacity is a heavy one." *Id*.

"Testamentary capacity" has been defined as the testator's ability to comprehend: (1) The nature and condition of his or her property; (2) His or her relations to those who are the natural objects of his or her bounty; and (3) The practical effect of the will. *Id.*; Fla. Stat. § 732.501. This does not mean that a person must be able to understand all details contained in a will or trust or that the person must know the specific dollar value of his or her property, only that the testator must have a general understanding of the effect of the document. There is a rebuttable presumption of testamentary capacity, and the burden is on those contesting a will to prove the lack of testamentary capacity. *See Schaefer v. Voyle*, 102 So. 7 (Fla. 1924).

A "testator may still have testamentary capacity to execute a valid will even though he may frequently be intoxicated, use narcotics, have an enfeebled mind, failing memory, [or] vacillating judgment." *In re Weihe's Estate*, 268 So. 2d 446, 451 (Fla. 4th DCA 1972).  In *Diaz v. Ashworth*, 963 So. 2d 731, 734 (Fla. 3d DCA 2007), the court found that the testator was competent to make a will even though the testator "knew he was going to die" and had made "an informed decision to accept hospice care instead of further treatment just prior to making" the subject will.

In this case Walter's doctors and nurses who were with him from March 19th until the date of his death on April 11th described Walter as follows: "No one controlled Walter" (Wacks), "Walter did not have trouble understanding him and that he was not demonstrably impaired at any time" (Rothschild), "strong minded and strong willed" (Stavrakas), On the morning of April 7th "awake and alert" (Mullings).

The Supreme Court of Florida established a framework for evaluating undue influence claims in *In re Carpenter's Estate*, 253 So. 2d 697 (Fla. 1971).  First, a presumption of undue influence arises upon a showing that a party (1) occupied a confidential relationship with the testator, (2) was a substantial beneficiary under the will, and (3) was active in procuring the instrument. *See Carpenter v. Carpenter (In re Estate of Carpenter)*, 253 So.2d 697, 701 (Fla.1971); *Estate of Brock*, 692 So. 2d 907, 911 (Fla. 1st DCA 1996).  As can be seen from the plethora of cases dealing with undue influence, establishing this presumption is fact intensive. This is particularly true in relation to the element of active procurement.  In *Carpenter*, the Supreme Court provided a nonexclusive list of criteria which are relevant to determining whether a beneficiary has been active in procuring a will. *Carpenter*, 253 So.2d at 702. Will contestants are not "required to prove all the listed criteria to show active procurement." *Id.* Indeed, "it will be the rare case in which all the criteria will be present." *Id.*

In consideration of the claim of undue influence the Court has considered the following *Carpenter* factors:

    a. ***Presence of the beneficiary at the execution of the will***

    b. ***Presence of the beneficiary on those occasions when the testator expressed a desire to make a will***

    c. ***Recommendation by the beneficiary of an attorney to draw the will***

    d. ***Knowledge of the contents of the will by the beneficiary prior to execution***

e. ***Giving of instructions on preparation of the will by the beneficiary to the attorney drawing the will***

f. ***Securing of witnesses to the will by the beneficiary***

g. ***Safekeeping of the will by the beneficiary subsequent to execution***

If the evidence rebuts the presumption of undue influence, or if the presumption never arises in the first place, it becomes the role of the trial court to determine, by the greater weight of the evidence, whether the facts support a finding of undue influence based on all of the evidence. *See Sun Bank/Miami, N.A. v. Hogarth*, 536 So. 2d 263, 267 (Fla. 3d DCA 1988). Ultimately, the [undue] influence must amount to over persuasion, duress, force, coercion, or artful or fraudulent contrivances to such an extent that there is a destruction of free agency and willpower of the testator." *Levin v. Levin*, 60 So. 3d 1116, 1118 (Fla. 4th DCA 2011) *quoting Raimi v. Furlong*, 702 So.2d 1273, 1287 (Fla. 3d DCA 1997).

Courts have recognized that changing a document such as a trust or will is insufficient to prove undue influence as it requires some showing that the alleged tortfeasor took improper actions. *See Newman v. Brecher*, 887 So. 2d 384, 386 (Fla. 4th DCA 2004). Further, merely having a close parent child relationship is not enough to show undue influence. *Estate of Kester v. Rocco*, 117 So.3d 1196 (Fla. 1st DCA 2013). Likewise, the acts of dutiful children in providing helpful information and advice, even on the topic of estate planning, is not undue influence. *See Carter v. Carter,* 526 So. 2d 141, 143 (Fla. 3d DCA 1988).

In *Derovanesian v. Derovanesian,* 857 So.2d 240 (Fla. 3d DCA 2003), the court considered an undue influence claim when the most recent estate plan was a significant change from prior estate plans that divided the estate equally between the four siblings. Four months prior to her death, the decedent amended her 2.3 million dollar estate plan by leaving each son $75,000 and the rest to her daughter, Mary. The brothers relied on *Carpenter* inferences to the effect that Mary helped

her mother secure an attorney, was present when the document was executed, and was aware of the contents both before and after execution.  The court noted that the decedent was an indomitable, fiercely independent individual, who was peculiarly unsusceptible to the influence of others.  In addition, the court considered the testimony of the drafting attorney and the testimony of witnesses who stated that the decedent had expressed to them what she was going to do with her estate.

In this case, the evidence demonstrated that (1) Ronald was not present when Walter and Lucille discussed estate planning with Mora, (2) Ronald was not present in the room when his father executed the documents on March 22, 2021 or April 7, 2021, (3) Walter had executed estate documents prior to March 2021, and he expressed his desired changes to those documents during private conversations with Mora prior to Mora drafting, and Walter executing, the 2021 Testamentary Documents. Both Mora and Ronald testified that Ronald was not part of these conversations. Indeed, one constant thing about Walter was that he was always thinking about changing his testamentary documents and he frequently told that to Chuck, Mora, Liz, and others when Ronald was not present.  Clearly, in March of 2021, Ronald was told by his father that he wanted to hire another estate lawyer and presumably told him that he wanted to make changes to his documents similar to what he had discussed with Dorothy Mullings, (4) Walter instructed Ronald to find him a new probate attorney, Ronald identified Mora through a referral and helped Walter arrange to meet with Mora. However, Ronald had never met Mora and did not have any relationship with him prior to Walter's death, (5) The Court heard no evidence that Ronald was aware of the contents of the changes set forth in the 2021 Testamentary Documents at any time prior to Walter's death. The only potential evidence is that Ronald contacted Roberta to get the correct name of her foundation.  There was evidence that Walter had asked Ronald to review Walter's 2018 Will and Trust in 2019, (6) Mora testified that the only instructions he received

regarding preparation of the 2021 Testamentary Documents came from Walter. While Ronald did send an email to Mora informing him that his parents wished to remove Liz as a beneficiary because Liz had not worked for his parents since July 2020, Walter had already asked Chuck to remove Liz as a beneficiary, and Chuck had drafted documents to do so in November of 2020, (7) There is no evidence that Ronald secured any of the witnesses to Walter's 2021 Testamentary Documents (Mora's legal assistant, Lynn Douglas, and the Lucille's CNA, Sandra Alvarez, who was caring for Lucille when Walter executed the 2021 Testamentary Documents), (8) Mora kept the 2021 Testamentary Documents following their execution in his possession.

The Court acknowledges that from the time Walter was admitted to the hospital on March 12, 2021 through March 19, 2021, once home through the date of his death, Walter suffered from terminal illness and was largely confined to his bed. As noted, Ronald spent every day with Walter throughout this period of physical and periods of mental decline. The medical evidence showed that Walter's physical health problems did not necessarily impact his mental acuity, although there were times when there was some confusion and forgetfulness.

The Court notes that while Ronald was spending everyday with Walter and Lucille from early March until Walter's death, he never isolated his parents from his other siblings. The truth was that the other siblings never wanted to come. The evidence showed that Ronald encouraged his siblings to come visit or to call their father. Randi wanted nothing to do with her father for most of her adult life. The evidence presented at trial, which was corroborated by multiple witnesses – including Roberta – demonstrated that Ronald encouraged family members to visit Walter before and after he executed the 2021 Testamentary Documents.

Ronald testified that the timing of the Tallahassee incident and his securing his lawyers actually worked out well because he had no other pending obligations and he was able to care for his

parents.  Ronald also kept Richard fully informed about Walter's health, and convinced him to visit Walter - which he did from April 1 to April 4, 2021. During Richard's visit, Ronald drove him to his parents' apartment every day, and drove him to the airport for his flight home.

Randi testified that Roberta had a good relationship with Ronald until Walter passed away, and that Roberta kept her informed about Walter's health in March and April 2021 based on daily updates Roberta received from Ronald.  Randi also visited Walter on April 7, 2021 and took a family photograph that was admitted in evidence.

In *Carter v. Carter*, 526 So. 2d 141 (Fla. 1st DCA 1988), the court found that there was no "undue influence" by a son over his mother's execution of her testamentary documents just because the son had "dutifully" cared for her. Florida courts have recognized that the mere existence of a close parent-child relationship is not enough to prove undue influence. *Kester*, 117 So. 3d at 1200. The acts of dutiful children in providing helpful information and advice, even on estate planning, is not undue influence. *See Carter*, 526 So. 2d at 143.

In *Carter*, one of the decedent's sons (James) was sued by his brother's ex-wife and son, who claimed that James had unduly influenced their mother to change her will to benefit their brother, Carl. It was uncontested that James shared a confidential relationship with his mother, that he served as the personal representative of his father's estate, and that his father predeceased his mother. It was also unchallenged that James' mother looked to him for assistance, and that when the two had discussed making changes to her will to remove Carl's ex-wife and children, James had his attorney draft said revisions. James also reviewed the changes with his mother and left her with the document to execute, which she did with Carl at the lawyer's office, in the presence of other witnesses. The court found there to be no undue influence, and that the sons' actions were "perfunctory physical activities" rather than active procurement, and were the acts of dutiful sons

who "helped their mother draw up her will and execute it" because she was aging and needed helpful information and advice. *Carter*, 526 So. 2d at 143.

## **CONCLUSION**

Based upon the foregoing, the Court finds that Walter Rubin did not lack testamentary capacity at the time he executed the 2021 Testamentary Documents, and that the 2021 Testamentary Documents were not the product of undue influence. Accordingly, it is ordered and adjudged as follows:

**As to the Probate Case No. 502021CP001979-XXXX-MB**

1. The 2021 Will is admitted to probate in accordance with Ronald's Second Amended Petition for Administration, dated May 4, 2021.

2. Ronald Rubin is hereby appointed personal representative of the Estate of Walter H. Rubin. Counsel shall submit Letters of Administration in connection with this appointment.

3. The Curator, Richard Comiter, is hereby relieved from further responsibility to administer the Estate of Walter H. Rubin and all prior orders vesting powers in the Curator are hereby terminated. The Curator is ordered to transfer all documents and assets regarding the Estate of Walter H. Rubin over to Ronald Rubin, as Personal Representative. The Curator shall file a final accounting within forty five (45) days.

4. The Court finds each party shall be responsible for their own reasonable attorneys' fees and costs

**As to the Trust Action: Case No. 50-2021-CP-004302-XXXX-MB**

5. The 2021 Trust, as amended, is the governing instrument in connection with the Estate of Walter H. Rubin.

6. The claims in Lucille's Amended Trust Complaint dated August 21, 2021 are *DENIED*.

7. The Court finds that each party shall be responsible for their own reasonable attorneys' fees and costs

   **DONE AND ORDERED** in chambers at Delray Beach, Palm Beach County, Florida this 22nd day of December, 2023.

502021CP001979XXXXMB    12/22/2023
Charles E. Burton  Circuit Judge

502021CP001979XXXXMB    12/22/2023
Charles E. Burton
Circuit Judge

_____

CHARLES E. BURTON
Circuit Court Judge

Copies furnished:

JAKE TAYLOR, Esquire, CLYDE SNOW & SESSIONS, 201 South Main Street, Suite 2200, Salt Lake City, Utah 84111, jst@clydesnow.com

BRIAN H. KOCH, Esquire and JOSHUA R. LEVENSON, Esquire, HOLLAND & KNIGHT LLP, 515 East Las Olas Boulevard, Suite 1200, Fort Lauderdale, Florida 33301
brian.koch@hklaw.com; joshua.levenson@hklaw.com

PETER J. FORMAN, Esquire ,GUTTER CHAVES JOSEPHER RUBIN FORMAN FLEISHER MILLER P.A.2101 NW Corporate Boulevard, Suite 107, Boca Raton, FL 33431
pforman@floridatax.com; jgaller@floridatax.com; nfleisher@floridatax.com;

MARK F. BIDEAU, Esquire, GREENBERG TRAURIG, P.A., 777 South Flagler Drive, Suite 300 East, West Palm Beach, Florida 33416
bideaum@gtlaw.com

J.B. MURRAY, Esquire, GUNSTER YOAKLEY & STEWART, P.A., 777 South Flagler Drive, Suite 500 East, West Palm Beach, Florida 33416
jbmurray@gunster.com

MICHAEL S. SINGER, Esquire, COMITER, SINGER, BASEMAN & BRAUD, P.A., 3825 PGA Boulevard, Suite 701, Palm Beach Gardens, Florida 33410
msinger@comitersinger.com

R. LEE MCELROY IV, Esquire, DOWNEY MCELROY, P.A., 3501 PGA Boulevard, Suite 201, Palm Beach Gardens, Florida 33410
lmcelroy@downeypa.com

CHRISTOPHER MARQUARDT, Esquire, ALSTON AND BIRD LLP, 1201 W. Peachtree Street, NW, Atlanta, Georgia 30309
Chris.marquardt@alston.com

RICHARD RUBIN
rarubin@gmail.com

# ADD 4

IN THE CIRCUIT COURT OF THE FIFTEENTH
JUDICIAL CIRCUIT, IN AND FOR PALM BEACH COUNTY, FLORIDA

IN RE: ESTATE OF

WALTER RUBIN,                                    CASE NO. 50-2021CP001979-XXXX-MB

Deceased.

_____/

**ORDER GRANTING REHEARING AND AMENDED FINAL ORDER GRANTING
LUCILLE RUBIN'S SECOND MOTION TO COMPEL PARTIAL DISTRIBUTION**

This cause came before the Court on April 17, 2025 and April 23, 2025, for a non-jury evidentiary hearing on Lucille Rubin's Second Motion to Compel Partial Distribution. Lucille Rubin is represented by Peter Forman, Esquire and Eric Rice, Esquire. The Estate is represented by Brian Koch, Esquire and Joshua Levenson, Esquire. Both sides presented proposed orders to the Court. Because Lucille's lawyers asked for an extension after the Estate had submitted their proposed orders, the Court granted the Estate an additional three days to file a response. Unfortunately, the Court was quick to sign and did not allow time for a response.

On May 7, 2025, the Estate filed a Motion to Amend Final Order informing the Court that it had neglected to give them the three days promised and further informed the Court the Estate will not appeal the Court's Order and advising that a check had already been sent to Lucille. The Court treats the Motion to Amend Final Order as a Motion for Rehearing. The Court has reviewed its notes from the testimony offered at the hearing. Accordingly, the Court grants the Motion for Rehearing as set forth in this Amended Order.

**FACTUAL FINDINGS AND LEGAL ANALYSIS**

Walter passed away on April 11, 2021. The Court is very familiar with the dynamics of the Rubin family. The Court spent a week with the Rubin family litigating the Guardianship of Lucille.

After that, the Court spent another week litigating the petition to revoke Walter's Will and Trust, held a two day hearing last year concerning Walter and Lucille's vast art collection and whether the art was owned by the Estate or Lucille, individually

The Estate pours over into the Second Amended and Restated Walter H. Rubin Declaration of Trust, as amended (the "Trust"), which provides for a marital trust for Lucille's benefit (the "Marital Trust"). Lucille is entitled to receive all the income from the Marital Trust. Lucille may also receive discretionary distributions from the principal for her welfare. When Walter died, the Estate had approximately $81 million in cash and marketable securities, plus interests in three limited liability companies that, in turn, own interests in commercial real estate. These LLCs are: Kingshop Company LLC, WLR Holdings, LLC (which owns 100% of numerous subsidiary LLCs), and Rubco LLC (collectively, the "LLCs").

In July 2023, Lucille moved to compel a partial distribution for the period from Walter's death through June 30, 2023. In October 2023, the Court ordered that the Curator distribute to Lucille the sum of $2,000,000, which was an estimate of the amount of income due to Lucille from April 12, 2021 through June 30, 2023. Following the initial trial, on December 31, 2023, Ronald Rubin was appointed as personal representative of the Estate and began acting as trustee of the Trust, trustee of the Marital Trust, and trustee of the sub-trusts for Ronald, Richard, and Roberta.

Lucille filed her Second Motion to Compel Partial Distribution on May 16, 2024. In addition to seeking a calculation and payment of income due to Lucille, the motion requested that Ronald fund the Trust, sub-trusts, and Marital Trust. On June 21, 2024, Ronald filed his Response to Second Motion to Compel Distribution to Lucille Rubin, wherein Ronald indicated that Lucille had been overfunded by $722,407.94 for the period of April 12, 2021, through May 31, 2024.  In

September 2024, Ronald funded the sub-trusts for Ronald, Richard, and Roberta. The remaining assets, including the LLCs, remained in the Estate.

In October 2024, the Court held a hearing on whether the "Court has authority to adjust the Estate's asset portfolio from principal to income, for fiduciary income purposes, for a specific time period for the purpose of calculating or modifying the amount of income to which Lucille is entitled to receive from the Marital Trust, and if so, for which time period the Court may exercise such authority." The Court found that it has the authority to rebalance or adjust the Estate's asset portfolio for the time period during which there was no fiduciary of the Estate taking into consideration the time period when the investment portfolio was growth-oriented and the time period when the portfolio was income-oriented. The relevant period is approximately April 12, 2021, until May 30, 2024 (the "Accounting Period").

On December 12, 2024, Lucille filed a Supplement to Second Motion to Compel Partial Distribution. In connection therewith and consistent with the Court's order on rebalancing, Lucille retained an expert, Patricia Koetting, to analyze the Estate's investment portfolio, review Ronald's calculations presented in his June 2024 response, and rebalance the investment portfolio. Based on Ms. Koetting's initial calculations, Lucille contended that she was owed an additional $1,233,633.34 for the Accounting Period. This amount included 100% of the income the Estate received from the LLCs.

On February 24, 2025, pursuant to this Court's Order dated February 10, 2025, Ronald funded the Marital Trust and transferred 100% of the Estate's interests in the LLCs to the Marital Trust.

The primary issues ultimately presented at the hearing were: (1) whether the investment portfolio was balanced over the course of the Accounting Period; (2) whether income taxes for the

years 2021 and 2022, which were paid in June 2024 (outside of the Accounting Period), are includable as disbursements in the period for which a fiduciary accounting was prepared, i.e. April 12 2021 through May 30, 2024; and (3) whether Lucille is entitled to all the income from the LLCs or merely the marital share of the LLC income.

The parties submitted various expert reports, and the Court heard testimony of five expert witnesses: Steven Tubbs, Ms. Koetting, Hank Fishkind, Darrell Horn, and Martin Cass. Mr. Tubbs was Walter and Lucille's CPA for many years, and he is now Lucille's CPA. Mr. Tubbs has testified before this Court various times in the Rubin family trials and hearings. The Estate retained Dr. Fishkind, an economist, to create a hypothetical portfolio. Mr. Horn was Walter and Lucille's investment advisor and remains the Estate and Trust's investment advisor. Mr. Horn, who is the executive chairman of Green Square Wealth Management, also testified on behalf of Ronald in the initial will and trust contest. Mr. Cass is a CPA hired by the Estate to prepare and file its tax returns and accountings.

Lucille's position is that the $2,000,000 previously paid to her was an underpayment of the income due to her and that she is entitled to an additional $957,663 for the period from April 12, 2021 to May 31, 2024.　The Estate's initial position is that overall, the Estate actually did have a balanced portfolio, and therefore no equitable adjustment is necessary. The Estate conceded that, based on the Estate's accountant's April 15, 2025 calculation of the Estate's actual income for the relevant time period, the $2,000,000 previously paid to Lucille represents an underpayment of the income due to her through May 31, 2024 of an additional $36,297 distribution for that time period.

<u>Expert Testimony Presented by Lucille</u>

As of June 2024, the Estate's position was that Lucille had been overfunded by over $700,000, which should either be refunded by Lucille or credited against future income due to her.

This was based on an accounting and estimate prepared by the Estate's accountant, Martin Cass, taking into consideration the actual and estimated income earned by the Estate's assets during the Accounting Period.

Following the Court's determination that Lucille was entitled to a balanced investment portfolio during the Accounting Period, Lucille retained Ms. Koetting to determine whether the actual income shown in Mr. Cass's report reflected a balanced investment portfolio. Ms. Koetting's initial review discovered multiple significant issues in Mr. Cass's report resulting in a large understatement of income allocable to Lucille, including the omission of $537,978 in Treasury bill redemption income, and substantial accrued interest paid on municipal bonds. Ms. Koetting's report indicating these errors was filed together with Lucille's Supplement to the Motion to Compel Partial Distribution.

Less than one week prior to the April 17th hearing, the Estate produced Mr. Cass's revised report, which did not address the issues Ms. Koetting raised in December. Ms. Koetting, in turn, revised her report and made adjustments to her calculations based, in part, on the changes made in Mr. Cass's revised report. The day before the hearing, the Estate produced Mr. Cass's second revised report, which finally included the amounts Ms. Koetting identified as missing in her December 2024 report. Ms. Koetting's final report upon which she based her testimony, indicated that Lucille is owed an additional $957,663.73 for the Accounting Period.

Ms. Koetting testified that her analysis rebalanced the investment portfolio comprised of the cash and marketable securities held by Green Square and, formerly, Raymond James, based on Green Square's guidelines in its investment policy agreed to by Ronald. The investment policy strives to achieve an approximate balance of 47% equities, 47% fixed income, and 6% cash equivalents. Ms. Koetting was instructed to allocate 45.8% of the income earned by these

investments to the Marital Trust, which represents the estimated percentage marital share of Estate assets originally calculated by the Curator and used by Mr. Cass in his initial report. This 45.8% allocation did not include any value in the Estate for the LLCs and inclusion of the LLCs would require an upward adjustment of the percentage used for the marital share. Ms. Koetting was also instructed to allocate 100% of the LLC income to the Marital Trust. Ms. Koetting's report included the LLC income "below the line," and she did not opine further on the issue. Unlike Mr. Cass, Ms. Koetting also did not include the June 28, 2024 disbursements of $609,568 for income taxes paid on the 2021 and 2022 income as a charge against or reduction in the income of the Estate.

Mr. Tubbs testified for Lucille.  Initially, Mr. Tubb's testimony focused primarily on the actual income earned by the LLCs. Mr. Tubbs was involved with the LLCs before Walter's death, and his involvement continued through much of 2024. Mr. Tubbs did not directly opine as to whether the Marital Trust and, thus, Lucille, should receive 100% of the LLC income. Instead, Mr. Tubbs analyzed Mr. Cass's report and the assignments of the LLC interests to the Marital Trust. Based on these documents, Mr. Tubbs observed that the Estate made the determination that the LLCs would be transferred to the Marital Trust in lieu of a proportionate division between the Marital Trust and the children's trusts. Further, it is equitable and consistent with the Estate's decisions that, if the LLCs were specially allocated to the Marital Trust, the income from the LLCs should also be specially allocated to the Marital Trust.

Mr. Tubbs also testified in rebuttal to Mr. Cass's testimony concerning the June 2024 disbursements for income taxes paid on the 2021 and 2022 income.  In support, Mr. Tubbs cited to section 738.102(9), Florida Statutes, which defines "net income" as "the total receipts allocated to income during an accounting period minus the disbursements made from income **during the period** . . . ." (emphasis added). Mr. Tubbs also relied on rule 5.346(a)(1), Florida Probate Rules,

which provides that a fiduciary account shall include "all cash and property transactions since the date of the last accounting or, if none, from the commencement of administration." According to Mr. Tubbs, a fiduciary accounting is prepared on a cash-basis, not an accrual-basis. Meaning, only transactions made during the relevant period are to be included in the accounting. The accrual of a tax (or other expense) is not yet a "disbursement," and a disbursement made after the accounting period is not a disbursement "during the period."

Including the taxes in the Accounting Period simply because those taxes were for the 2021 and 2022 income taxes also implies that any LLC income accrued during the Accounting Period but not received until the subsequent period should also be included in the accounting, which Mr. Tubbs noted that Mr. Cass correctly did not do in his accounting. In Mr. Tubbs' opinion, this confirms the cash-basis approach for fiduciary accountings.

Mr. Tubbs further testified that it would be appropriate and consistent with rule 5.346(b)(6), Florida Probate Rules, and section 736.08135(2)(e), Florida Statutes, to include a footnote on the accounting to notify the beneficiary of the taxes to be paid in the subsequent period. The application of section 736.08135(2)(e), Florida Statutes, was a point of contention. Mr. Tubbs opined that the statute does not require adjustments to income for accrued expenses and is merely a disclosure requirement mandating that trust accountings reflect those accruals.

Expert Testimony Presented by the Estate

Dr. Fishkind and Mr. Horn performed similar analyses and each constructed hypothetical asset portfolios to calculate the hypothetical income attributable to the Marital Trust for the Accounting Period. Dr. Fishkind and Mr. Horn both included an estimated valuation of the LLCs in the overall portfolio. The valuations are based on tax appraisals of the commercial properties,

not actual appraised values. The inclusion of the estimated values of the LLCs in the rebalancing starkly contrasts with the analyses prepared by Ms. Koetting and Mr. Cass.

Dr. Fishkind opined that Lucille was overpaid by $455,171 in his hypothetical scenario. Dr. Fishkind's calculations utilize a money market account and do not follow the standards outlined in the Green Square investment policy. Notably, Dr. Fishkind's analysis also did not conform to the Court's Order on rebalancing, which indicated that the Estate's investment portfolio should be rebalanced. Dr. Fishkind testified that his analysis and hypothetical portfolio was based only on a portion of the Estate assets which he allocated to the Marital Trust. He even testified that his approach would produce a different net income result than if he had calculated the Estate's net income as a whole.

Mr. Horn and Green Square managed Walter's investment portfolio prior to Walter's death and they currently manage the Estate and Marital Trust's investment portfolio. Mr. Horn testified that he has never managed Walter or the Estate's interests in the LLCs. Mr. Horn opined that Lucille was overpaid by $127,130.86. Mr. Horn testified that Walter intended for Lucille to receive approximately $400,000-500,000 in income per year from the assets invested at Green Square. Presumably, these income targets did not include assets outside of Green Square, such as the LLCs.

Martin Cass was hired to assist in preparing the fiduciary accounting and calculating the actual income earned by the Estate. Mr. Cass's calculation of actual income has changed significantly since his initial report in June 2024. Mr. Cass initially opined that Lucille had been overpaid by $722,407.94. As of this hearing, Mr. Cass's testimony is that Lucille is entitled to an additional distribution of $36,297 for the Accounting Period. The vast changes are due to errors Mr. Cass admitted to making in his initial reports.

Mr. Cass testified that only the marital share of the LLC income is attributable to the Marital Trust based, in part, on section 738.201(1), Florida Statutes, which states that a beneficiary is entitled to receive income generated by an estate asset from the date of the decedent's death only if that asset was "specifically given to a beneficiary." In Mr. Cass's opinion, Walter did not "specifically" give the LLCs to the Marital Trust and, instead, it was the personal representative who allocated the LLCs to the Marital Trust. Mr. Cass testified that the LLC income is simply added to the "pot" of Estate assets.

Finally, Mr. Cass testified concerning his inclusion of the June 2024 payment of income taxes in his calculations for the Accounting Period. Mr. Cass relied on section 736.08135(2)(e), Florida Statutes, which states that a trust accounting must reflect accruals when the allocation affects the beneficiary's interest. In Mr. Cass's opinion, the inclusion of the taxes in this situation is appropriate. Notably, Mr. Cass acknowledged that he treated the tax payment differently on the Estate's 2024 fiduciary accounting, under which he used an exclusively cash-basis approach. Mr. Cass also acknowledged that the taxes would reduce any income payable to Lucille in the subsequent period if they are not included in the accounting for this Accounting Period.

## Determination of Income

Pursuant to section 738.301, Florida Statutes, Lucille's right to income began as of the date of Walter's death. The evidence presented at the hearing indicates that there is no material disagreement regarding the calculation of actual income received by the Estate. In fact, Ms. Koetting's rebalanced portfolio results in only a marginal increase in income due to Lucille. Instead, the treatment of the LLC income and the inclusion of the June 2024 tax payment cause the significant difference in the calculations. Consistent with the Court's November 2024 Order, the Court adopts Ms. Koetting's calculations relating to the rebalancing of the investment portfolio.

The Court recognizes that Dr. Fishkind and Mr. Horn's calculations indicate significant overpayment to Lucille. However, the Court finds that Dr. Fishkind and Mr. Horn's use of estimated instead of appraised valuations of the LLCs was not appropriate in these circumstances. Mr. Tubbs and Mr. Cass had differing opinions on the use of the property tax estimated values for the real property instead of obtaining appraised values of the LLCs. Mr. Cass opined that the inherent undervaluation in the property tax estimates reflects the discounts the LLCs would receive for their lack of marketability. Mr. Tubbs' testified that the purported discounts are speculative and were only appropriate for use on the initial tax filings (prepared and filed by Mr. Tubbs) because, at the time, it was not possible to obtain appraisals. The Court agrees that, at least for the purposes of this hearing, the use of the property tax estimated values is improper.

Moreover, the evidence and testimony as supported by the language of Walter's Trust, reflect that the LLCs have always been treated as separate and distinct assets from the cash and marketable securities. The reason for this is plain: the LLCs are an entirely different class of assets. This is consistent with the special investment provisions in the Trust, which classify the LLCs as "special investments", and the terms of the Green Square Investment Policy. The LLCs are distinguishable from the cash and marketable securities and should remain separate in these calculations.

Additionally, as to Mr. Horn's testimony that Walter intended for Lucille to receive $400,000-500,000 in income per year is irrelevant to the calculation of the net income of the Estate and/or Marital Trust because there is no explicit provision in the Trust to adjust income to that effect.

<u>Treatment of the LLCs</u>

The Court finds Mr. Tubbs' testimony on this issue to be credible. The Court finds section 738.301, Florida Statutes, instructive. Lucille's right to income began as of the date of Walter's death. The Court acknowledges the provisions of section 738.201, Florida Statutes, and Mr. Cass's testimony, but is not persuaded in this instance. Florida law is clear that the Court has the authority to intervene in the administration of a trust and may exercise control over a trustee's exercise or non-exercise of discretionary powers. Fla. Stat. §§ 736.0201 and 738.105. The Court is fully apprised of the Rubin family dynamic and Ronald's various fiduciary roles. Specifically, the Rubin fighting appears to be the girls against the boys and the boys against the girls. Here, the Court will make the necessary adjustments consistent with Lucille's rights as income beneficiary. The equities require that the Court make such adjustments in this instance.

Accordingly, the Court finds that Lucille is entitled to 100% of the income earned from the LLCs during the Accounting Period. The Court notes Mr. Tubbs' agreement with Mr. Cass's explanation concerning the treatment of the $23,527.05 distribution received by the LLCs. This amount appears to have been properly treated as principal and should be excluded from any income due Lucille.

<u>Treatment of Income Taxes</u>

The final issue presented at the hearing is whether the 2021 and 2022 income taxes paid on June 28, 2024 are includable as deductions from the income earned during the Accounting Period.

The primary source of conflict is whether the accounting for the Accounting Period should be prepared on a cash-basis or accrual-basis. Mr. Tubbs relied on section 738.102(9), Florida Statutes and rule 5.346(a)(1), Florida Probate Rules. In contrast, Mr. Cass relied on section 736.08135(2)(e), Florida Statutes. Upon review, the Court agrees with Mr. Tubbs that section

736.08135(2)(e), Florida Statutes, while instructive, is solely a disclosure requirement, mandating what must be reflected in a trust accounting whereas section 738.102(9), Florida Statutes, explicitly defines net income as total receipts during the relevant period minus disbursements made during that period.  Simply put, the taxes actually paid on June 28, 2024 should be reflected in the next accounting period.

The Court further notes that the Florida legislature dedicated an entire separate chapter (Ch. 738) to deal exclusively with the computation of principal and income. In contrast, Chapter 736 and the sections pertaining to trust accountings is descriptive of content – what must be disclosed in an accounting – not computation.  The Court construes section 736.08135(2)(e), Florida Statutes, as providing that accruals should be disclosed to apprise the beneficiaries of them, but it does not direct or authorize an accrual-basis approach that is not otherwise authorized by Chapter 738 or the trust instrument.

The Court also notes that Mr. Cass testified that he used a cash-basis approach for the fiduciary accounting of this Estate. The Estate's attempt to use an accrual-basis approach for this matter is unsupported and is a clear attempt to massage the income amount due to Lucille in a manner adverse to her. Consistent with Florida law, the income taxes paid on June 28, 2024, will be deducted from any receipts in the subsequent period during which the payments were actually made.

The Court finds that Mr. Tubbs' opinion on this issue is more credible and finds that the taxes should not be included as deductions from the income earned during the Accounting Period but should be covered in the next accounting period.

<u>Amounts Due to Lucille</u>

Based on the foregoing, the Court finds that the Curator's estimated distribution of $2,000,000 was appropriate considering the facts known at the time. In addition, Lucille is now due $934,136.68 for the balance of the Accounting Period. This sum reflects a balanced investment portfolio consistent with Ms. Koetting's analysis, plus 100% of the income from the LLCs, minus $23,527.05.

<u>Lucille's Entitlement to Attorneys' Fees and Costs</u>

Section 733.106, Florida Statutes, provides that "[a]ny attorney who has rendered services to an estate may be awarded reasonable compensation from the estate." Walter plainly intended for Lucille to receive all income produced by the Marital Trust. In successfully advocating for her income rights, Lucille is preserving Walter's testamentary intention. *See Samuels v. Estate of Ahern*, 436 So. 2d 1096, 1097 (Fla. 4th DCA 1983) (interpreting the services that entitle a party to fees as "not restricted to services that bring about an enhancement in value or an increase in the assets of the estate, but also includes services that are successful in simply effectuating the testamentary intention set forth in the will"). Further, the evidence is clear that Lucille and her attorneys have rendered services to the Estate by identifying multiple significant errors in the Estate's calculations of fiduciary income, including the misallocation of treasury bill income and accrued interest paid on municipal bonds. As such, Ronald failed to accurately account and/or refused to properly account for the fiduciary income, and Lucille's counsel provided substantial assistance in ensuring all income is appropriately reflected in the accounting. *See In re DuVal's Estate*, 174 So. 2d 580, 587 (Fla. 2d DCA 1965).

Similarly, Lucille is entitled to her reasonable attorneys' fees and costs pursuant to section

736.1005, Florida Statutes. Section 736.1005 provides that "[a]ny attorney who has rendered services to a trust may be awarded reasonable compensation from the trust." Here, Lucille has rendered services to the Marital Trust in several ways. First, Lucille's pleadings in this matter requested that the Court require Ronald to fund the Marital Trust. In February 2025, consistent with Lucille's requests, the Court ordered Ronald to partially fund the Marital Trust. Second, the income earned by the LLCs will now be properly distributed to the Marital Trust.

Candidly, this Court is not a big proponent of attorneys' fees in probate litigation. The Rubin children benefitted greatly from the largess of their parents. The only party who is entitled to always benefit is their mother, Lucille, who was Walter's partner in business, life and parenting. She should not have to beg in order to receive every dollar that she is entitled to receive. Given the tens of millions of dollars involved, this Court would certainly understand a discrepancy of $10,000 or $20,000 dollars. Here, the Estate's initial position was that Lucille was overpaid and now owed the Estate over $722,000. Then, on the eve of the hearing, the Estate suddenly agreed that Lucille was not overpaid and is in fact entitled to at least an under payment of $36,000. The Estate's failure to timely assess the issues presented by Lucille has caused substantial fees to both Lucille and the Estate and Trust.

For the reasons stated above, Lucille is entitled to her reasonable attorneys' fees and costs incurred in this matter.

Based upon the credible evidence presented to this Court, it is:

**ORDERED AND ADJUDGED** that Lucille is entitled to an additional payment of income in the total amount of $934,136.68. Ronald Rubin, as personal representative of the Estate, shall effect such payment within five (5) days from the date hereof.

It is further **ORDERED AND ADJUDGED** that Lucille is entitled to her reasonable attorneys' fees and costs incurred in this matter. The Court reserves jurisdiction to determine the amount of such fees and costs.

**DONE AND ORDERED** in chambers at Delray Beach, Palm Beach County, Florida.

502021CP001979XXXXMB   05/09/2025
Charles E. Burton   Circuit Judge

502021CP001979XXXXMB   05/09/2025
Charles E. Burton
Circuit Judge